THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Plaintiff and Counterdefendant-Appellant, *v.* CHICAGO TEACHERS UNION, LOCAL 1, AMERICAN FEDERATION OF TEACHERS, *et al.*, Defendants and Counterplaintiffs-Appellèes.

First District (1st Division)    No. 79-1121

Opinion filed October 20, 1980.

Michael J. Murray, of Chicago (Richard E. Girard and John L. Wren, of counsel), for appellant.

DeJong, Poltrock & Giampietro, of Chicago (Lawrence A. Poltrock, Wayne B. Giampietro, and Gregory N. Freerksen, of counsel), for appellees.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

On June 16, 1977, the Board of Education of the City of Chicago (Board) closed all schools and laid off all employees for economic reasons. Thereafter, the Chicago Teachers Union (Union) sought binding arbitration, alleging that the layoff violated its collective bargaining agreement with the Board. The Board brought an action to enjoin the arbitration and the Union counterclaimed, alleging that the one-day layoff constituted a breach of contract. Following a bench trial, the circuit court enjoined arbitration, but found that the Board breached its contract with the Union. The court further ordered the Board to pay employees covered by the collective bargaining agreement for the day on which schools were closed. The Board appeals.

On October 13, 1976, the Board and the Union entered into a collective bargaining agreement for the school year of September 1, 1976, to August 31, 1977. Provisions were made for annual salaries for teachers and career service employees.

On February 23, 1977, the Board adopted a recommendation which allowed the general superintendent of schools, Dr. Joseph Hannon, to lay off employees for up to three days during June 1977. This action was intended to reduce the deficit in the Board's budget. Subsequently, Superintendent Hannon announced, in a press release dated March 24, 1977, that the schools would close "one day early in June rather than the three days originally contemplated." The schools closed one day early on June 16, 1977, rather than on June 17, 1977, the date provided by the official school calendar.

Arbitration concerning the layoff was initiated by the Union but permanently enjoined by the circuit court. On November 3, 1978, more than three months after trial, the Union filed a motion to conform the pleadings to the proof. The trial court granted this motion over the Board's objection and allowed the Union to file an amended counterclaim for money damages. On March 16, 1979, the trial court issued a memorandum opinion. On April 19, 1979, the court entered a declaratory judgment finding the Board had breached the contract by failing to pay teachers' salaries for June 17, 1977. The court also ordered an accounting of the salaries due and payment for each employee. On May 17, 1979, the trial court stayed its order requiring payment of one day's salary pending appeal. The order for an accounting was not stayed.

Testimony before the trial court essentially pertained to the financial condition of the Board and the circumstances surrounding the making of the collective bargaining agreement. There was a substantial shortage of funds available to the Board for the 1976-1977 school year as documented in the school budget and 1977 annual financial report. There was a carry-over shortage from previous years of about $53 million, plus a State aid penalty of about $10 million[1] for an accumulated deficit of about $63 million. Moreover, there was a projected operating shortage of about $52 million. This deficit constituted the difference between projected revenues and projected requirements. The Board's financial difficulties were exacerbated by a substantial uncertainty concerning the collection of outstanding taxes. The total budgeted deficit for fiscal 1976-1977 was about $115 million.

The Board's 1977 annual financial report was admitted into evidence and revealed: Teachers' salaries were budgeted as a line item appropriation under the educational fund, the primary fund to which salary costs are charged. The Board budgeted about $506 million as the projected requirement for teachers' salaries calculated in accordance with its collective bargaining agreement with the Union. Expenditures for the fiscal year for this line item amounted to about $488 million. Thus, expenditures were under appropriations by about $18 million.

The next line item was designated pro rata. This budgeted appropriation was about negative $91 million. The pro rata line was defined as a mechanical bookkeeping device that permitted the Board's budget to appear to be balanced when the appropriations for the total of the individual line items exceeded the anticipated revenue. The Board inserted this pro rata line item to present a balanced budget as required

---

[1] This figure represented one-third of a State aid penalty assessed against the Board because the Chicago public schools were closed 16 days early in fiscal 1975-1976. The remaining portion of the penalty was to be paid in the following two fiscal years. See *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 54, 360 N.E.2d 360.

by statute. (Ill. Rev. Stat. 1975, ch. 122, par. 34-44.) Thus, applying the pro rata reduction to teachers' salaries resulted in a reduction of that figure to about $414 million. In their 1976-1977 budget, the Board merely summarized this procedure, listing about $414 million as available for expenditure appropriations for teachers' salaries. However, in a separate miscellaneous account, the Board appropriated the same negative pro rata amount of about $91 million. Accordingly, the listed appropriation of $414 million constituted $506 million minus the $91 million pro rata figure.

In a similar fashion, the next line item under the educational fund, civil service salaries (about $132 million) was reduced by a pro rata line (about $23 million). This reduction process was also summarized by the Board in its budget so that only the reduced total figure (about $108 million) was listed. This pro rata reduction process was also noted in the miscellaneous account.

The total of the two pro rata line items amounted to about $115 million, which equalized the Board's total budgeted deficit for fiscal year 1976-1977. No pro rata lines were listed for any of the other 12 Board funds nor applied to other line items in the educational fund. The Board adopted this bookkeeping method because it believed that its financial deficit had to be specifically applied to line items in the budget, and the greatest expenditure in the educational fund was for salaries.

Finally, the annual financial report shows that at the end of the fiscal year the educational fund had an operating surplus of about $13 million, representing revenues in excess of expenditures from current operations. The Board reduced its accumulated deficit by about $17 million during the 1976-1977 school year. Nonetheless, at the close of the year the total educational fund deficit was about $70 million. It was also established that it would cost the Board about $2.8 million to pay the teachers one day's salary.

The trial court heard extensive extrinsic evidence concerning the collective bargaining agreement negotiations. During June 1976 the Board laid off teachers for 16 days. In light of this layoff, the question of employee security and a full 39-week year became paramount in the negotiations. The Union requested a clause in the contract or a written guarantee separate from the contract assuring a full 39-week year. The Board refused both requests. Following a third Union request for a written guarantee, the Board made a statement prepared by Superintendent Hannon to the Union negotiating team as follows:

> "Our top priorities are to maintain a full and qualitative school year and to provide stability for a half-million school children, their parents, our staff members, and the citizens of the City of Chicago."

Thereupon, the contract in question was executed by the parties.

On appeal, no issue is raised concerning the trial court's order enjoining arbitration. This controversy basically concerns the following contract terms:

"ARTICLE 36 — SALARIES

36-1. The annual salaries of all teachers and the prorated monthly segments thereof are set forth in the teacher salary schedules attached hereto as Appendix A. Such schedules and all other provisions governing compensation and remuneration contained in Appendix A are hereby made a part of this Agreement.

36-2. The annual salaries of all career service employees in the bargaining unit and the prorated monthly segments thereof are set forth in the career service salary schedules hereto attached in Appendix A. Such schedules and all other provisions governing compensation and remuneration contained in Appendix A are hereby made a part of this Agreement.

36-3. In accordance with the provisions of the School Code of Illinois, salary schedules and compensatory and remuneration provisions in this Agreement shall be subject to the terms, provisions, and conditions of the appropriations therefor contained in the fiscal 1976-77 annual and supplemental school budgets."

The Board asserts that the contract does not guarantee a 39-week school year. It further contends that the contract is expressly subject to a limitation in the annual budget whereby the Board reserved the right to lay off teachers because of lack of funds. The Union maintains that the agreement requires that the board pay full 39-week annual salaries, that the budget is not subsumed in the agreement, and the school calendar provides for a complete 39-week school year.

We note initially that 36-1 and 36-2 of the agreement require that the Board pay "annual salaries." Appendix A to the agreement specifically incorporated teacher salary schedules into the contract. Schedule 1A states that the "[b]asic schedule of school month salaries and annual* salaries [is] based upon a 6-hour day during regular school term of 39 weeks for regularly appointed members of the teaching staff * * *." The asterisk refers to a footnote which reads: "The annual salary is indicated in parenthesis, ( ), and includes the payment of ten days of vacation so that it is based upon 41 weeks of pay for 39 weeks of employment." Similar salary schedules are set forth for teachers on 45, 47, 49 and 52 week payment plans. In addition, 44-21 provides in part:

"The Board shall maintain a school calendar in which: Employees scheduled for 39 weeks shall receive their *annual salary* (including vacation pay) prorated over 41 weeks (39 weeks and two weeks of vacation). * * *" (Emphasis added.)

■■■ The most reliable index of the parties' intent is the language of the

contract. (*Body v. United Insurance Co.* (1979), 72 Ill. App. 3d 594, 391 N.E.2d 19.) When contract terms are clear and unambiguous, they must be given their ordinary and natural meaning (*Qazi v. Ismail* (1977), 50 Ill. App. 3d 271, 364 N.E.2d 595), and no parol or extrinsic evidence may be considered to vary the terms' meaning. (*Titchener v. Avery Coonley School* (1976), 39 Ill. App. 3d 871, 350 N.E.2d 502.) Assertions by the parties that contrary meanings should be ascribed to contract provisions are not determinative of whether such provisions are ambiguous. (*Tondre v. Pontiac School District No. 105* (1975), 33 Ill. App. 3d 838, 342 N.E.2d 290.) Whether or not an ambiguity exists in a contract is to be determined by the court as a matter of law. *Zannis v. Lake Shore Radiologists, Ltd.* (1979), 73 Ill. App. 3d 901, 392 N.E.2d 126.

■■ We believe the clear import of the contract terms is that the parties contemplated and agreed to a regular school year of 39 weeks and that teachers would be paid annual salaries for that complete period. We do not reach the question of whether the contract requires the Board to keep the schools open for 39 weeks; rather, we only rule that it is obligated to pay the teachers their complete annual salaries. The term "salary" has a well-established meaning: "A salary is a fixed, annual, periodical amount payable for services and depending upon the time of employment and not the amount of services rendered." (*In re Sanitary District Attorneys* (1932), 351 Ill. 206, 274, 184 N.E. 332; see also *Commonwealth Life & Accident Insurance Co. v. Board of Review* (1953), 414 Ill. 475, 485, 111 N.E.2d 345.) Moreover, the agreement does not call for piecemeal salaries calculated upon a daily, weekly or monthly basis. Accordingly, we need not consider parol evidence admitted by the trial court; the prior negotiations of the parties are merged into the integrated contract. See *World Insurance Co. v. Smith* (1975), 28 Ill. App. 3d 1022, 329 N.E.2d 518.

■■ The Board asserts, however, that clause 36-3 of the agreement is pivotal to determining the parties' intent:

> "36-3. In accordance with the provisions of the School Code of Illinois, salary schedules and compensatory and remuneration provisions in this Agreement shall be subject to the terms, provisions, and conditions of the appropriations therefor contained in the fiscal 1976-77 annual and supplemental school budgets."

It contends that 36-3 subjects the contract to the following introductory provision of the Board's budget:

> "Section 3. That the appropriations herein made for salaries and wages for officers and/or employees shall be regarded as maximum appropriations both as to the sum appropriated and the length of time for which the incumbent of each position is to be employed. *No employee shall have the right to demand continuous employment and compensation by reason of the appropriation if it*

*becomes necessary to lay him off on account of lack of work or lack of funds."* (Emphasis added.)

We disagree. The prefatory language of 36-3, "[i]n accordance with the provisions of the School Code of Illinois, * * *" is important in discerning the parties' intent. Section 34—49 of the School Code (Ill. Rev. Stat. 1975, ch. 122, par. 34—49) provides:

> "No contract shall be made or expense or liability incurred by the board, or any member or committee thereof, or by any person for or in its behalf, notwithstanding the expenditure may have been ordered by the board, unless an appropriation therefor has been previously made. Neither the board, nor any member or committee, officer, head of any department or bureau, or employee thereof shall during a fiscal year expend or contract to be expended any money, or incur any liability, or enter into any contract which by its terms involves the expenditure of money for any of the purposes for which provision is made in the budget, in excess of the amounts appropriated in the budget. Any contract, verbal or written, made in violation of this section is void as to the board, and no moneys belonging thereto shall be paid thereon.
> * * *."

Existing law (including statutory law) becomes a part of a contract as fully as if it were expressly incorporated in the agreement. (*Perlman v. First National Bank* (1973), 15 Ill. App. 3d 784, 305 N.E.2d 236, *appeal dismissed* (1975), 60 Ill. 2d 529, 331 N.E.2d 65.) In our view, 36-3 was merely an express recognition that the School Code requires an appropriation for every expenditure by the Board. Once the Board makes the appropriation in its budget, thereby implementing the salary provisions of the agreement, the Board's contractual obligation is fixed and the conditions of 36-3 are satisfied.

In *Board of Education v. Chicago Teachers Union* (1975), 26 Ill. App. 3d 806, 812, 326 N.E.2d 158, the court reached a similar interpretation of predecessor clause 36.3 which "expressly made the proposed salary increases subject to anticipated 1971 and 1972 annual and supplemental school budgets." The court found that this provision evidenced the fact that the Board and the Union knew of the prohibitions contained in section 34—49.

Accordingly, under our interpretation 36-3 neither defeats the Board's clear obligation to provide annual salaries nor creates any ambiguity or inconsistency with 36-1 and 36-2.

■■ Our next consideration is whether or not the Board appropriated sufficient funds to provide for salaries under the contract. The agreement and budget were contemporaneous documents. The contract was executed and the budget was adopted on October 13, 1976. Both had

retroactive effective dates of September 1, 1976. The budget reflected about $414 million available for teachers' salaries appropriations. However, if this is the correct appropriation, then the Board executed the agreement knowing it was void under section 34—49 of the School Code (Ill. Rev. Stat. 1975, ch. 122, par. 34—49), since it projected teacher salary requirements of about $506 million. Courts will construe contract provisions to make the contract legal and enforceable when that can reasonably be done. (*Stearns v. Western* (1967), 87 Ill. App. 2d 465, 232 N.E.2d 126.) Similarly, since the contract is subject to the appropriations, we will not construe that item to void the contract. Rather, we believe the Board was on the horns of a dilemma. They were required by law to both present a balanced budget and appropriate sufficient funds to cover salaries under the collective bargaining agreement. The Board's response to this dilemma was the pro rata accounting technique. The trial court found that setting off the entire $115 million deficit against teachers' salaries and career service employees' salaries was "accounting legerdemain employed by the BOARD to evade its obligation to provide a full, 39 weeks, school year of teaching * * *." Although this might be fair comment upon the Board's litigation strategy, we do not ascribe this intent to the Board in drafting the budget. Instead, it adopted an ambiguous accounting technique giving the appearance of both a balanced budget and sufficient appropriations to satisfy the agreement. The budget, in fact, was not balanced and when the arbitrary pro rata device is discounted there are sufficient appropriations to satisfy clause 36-3 and to uphold the agreement under section 34—49 of the School Code. Accordingly, we interpret the budget as consistent with the annual report, *i.e.*, about $506 million was appropriated for teachers' salaries.

If the Board's position were correct, it would not have been able to spend the amount it actually did on teachers' salaries. It would have been able to expend only about $414 million (about $506 million appropriated, less about $91 million pro rata line). In fact, it spent about $488 million on those salaries, graphically demonstrating that the Board did not feel constrained by the supposed limitations of the "pro rata line."

Even if we assume *arguendo* that the contract does not unequivocally obligate the Board to pay annual salaries and that the agreement is subject to the introductory language of the budget, we do not agree with the Board that it was necessary to lay the teachers off due to lack of funds. The trial court explicitly rejected this factual assertion, finding that the educational fund operated within current revenues and had a surplus of 13.259 million dollars for the year in question. Only through the application of the accumulated deficit through the pro rata accounting device can the Board assert a lack of funds as a defense to its contractual obligations to the teachers.

However, when the collective bargaining agreement was executed the parties knew about the Board's tremendous deficit. Moreover, both the Board and the Union were concerned about avoiding another early school closing in light of the disastrous consequences of the previous year's early closing. The Board's construction of the term "lack of funds" would allow it an unlimited opportunity to lay off teachers at any time because of its accumulated deficit.

■■ We do not believe the parties intended this result. Courts will give a reasonable construction to contracts rather than one leading to absurd results. (*Parker v. Arthur Murray, Inc.* (1973), 10 Ill. App. 3d 1000, 295 N.E.2d 487.) Also, a construction is favored which will be most equitable to both parties instead of one which will give one party an unfair advantage. (*Osborn v. Novo Card Publishers, Inc.* (1960), 24 Ill. App. 2d 187, 164 N.E.2d 511.) The only equitable construction of "lack of funds" would be current expenditures over appropriations. Since the evidence indicates that expenditures were under appropriations by about $18 million, and the educational fund showed an operating surplus of about $13 million, we do not find a lack of funds as envisioned by the parties to justify a personnel layoff.

■■ Related to the subject of lack of funds is the doctrine of impossibility of performance. Generally, impossibility of performance does not discharge a contractual duty. This rule applies where the impossibility arises subsequent to the execution of the contract and especially where the event causing the impossibility can be foreseen and guarded against in the contract. Insolvency of the promisor will not discharge one from his duty to perform. (*Felbinger & Co. v. Traiforos* (1979), 76 Ill. App. 3d 725, 394 N.E.2d 1283.) The contingency of lack of funds was certainly foreseeable in light of the Board's accumulated deficit and could have been expressly provided for in the agreement. Indeed, the Board is charged by law with the responsibility of sound fiscal management. (See Ill. Rev. Stat. 1975, ch. 122, pars. 34—16, 34—18(8), 34—43 and 34—44.) In a different context, our supreme court noted:

> "* * *[A]rticle X, section 1, of the Illinois Constitution (Ill. Const. 1970, art. X, sec. 1) * * * declares that a fundamental goal of this State is to provide for the free, quality education of all people (to the best of their ability), and directs that the State shall provide for an efficient system of educational institutions and services to implement said goal. (See *Board of Education v. Redding* (1965), 32 Ill. 2d 567, 572; *Allen v. Maurer* (1972), 6 Ill. App. 3d 633, 639-40.) The responsibility for effectuating this constitutional mandate is delegated to the school boards."

*Bond v. Board of Education* (1980), 81 Ill. 2d 242, 247-48, 408 N.E.2d 714.

■■ Not only is the Board obligated by law to honor its contracts as would

an individual (see *City of Chicago v. United States Fire Insurance Co.* (1970), 124 Ill. App. 2d 340, 260 N.E.2d 276), but it must practice sound management in planning its budget and entering into contracts. This duty necessitates setting the duration of the school year within the financial limitations of the Board. This would entail financial predictions by the Board in setting its school calendar (Ill. Rev. Stat. 1975, ch. 122, par. 10—19) and in contract drafting. In short, if the Board believes its resources will not be sufficient to compensate teachers for a full 39-week school year, then it should expressly contract for a lesser term.[2] In other words, the Board must accurately assess its financial position and not promise contractually what it cannot deliver financially.

■■ The Board raises other contentions that we shall discuss briefly. It argues that its discretionary power to fix salaries of teachers cannot be delegated or limited by a collective bargaining agreement. It has long been held that a board's authority to contract for teachers' services is a discretionary power that cannot be delegated. (*Lindblad v. Board of Education* (1906), 221 Ill. 261, 77 N.E. 450; *Elder v. Board of Education* (1965), 60 Ill. App. 2d 56, 208 N.E.2d 423.) This discretionary power may not, through a collective bargaining agreement or otherwise, be delegated to a third party such as an arbitrator. (*Illinois Education Association Local Community High School District 218 v. Board of Education* (1975), 62 Ill. 2d 127, 340 N.E.2d 7; *Board of Education v. Johnson* (1974), 21 Ill. App. 3d 482, 315 N.E.2d 634.) In the instant case, however, the Board did not improperly delegate its discretion; rather the Board exercised its discretion when it entered into the agreement and adopted the specific annual salaries set forth therein and also adopted a budget. *Cf. Libertyville Education Association v. Board of Education* (1977), 56 Ill. App. 3d 503, 371 N.E.2d 676 (not a delegation of board's discretionary power where no third party was to determine salary but mutually agreed-to formula was to be used).

Finally, the Board asserts that it can lawfully lay off employees to reduce its financial deficit from prior years. It cites a variety of authorities, including *Kennedy v. City of Joliet* (1942), 380 Ill. 15, 41 N.E.2d 957, *Thomas v. City of Chicago* (1916), 273 Ill. 479, 113 N.E. 140, and *Fitzsimmons v. O'Neill* (1905), 214 Ill. 494, 73 N.E. 797. In these cases the courts found the power to discharge or lay off employees existed independently of the provisions of civil service statutes. These cases are distinguishable because they dealt with employees claiming rights guaranteed under civil service acts who did not assert any contractual right to continued employment.

---

[2] The Board could not, consistent with its statutory duty of sound financial management, set the duration of the school year as less than the minimum number of days required to avoid State aid penalties. Ill. Rev. Stat. 1975, ch. 122, pars. 10—19 and 18—12.

For all the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.