(No. 54274.—

THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Appellant, v. CHICAGO TEACHERS UNION, LOCAL 1, *et al.*, Appellees.

*Opinion filed December 18, 1981.*

64

SIMON, J., dissenting.

Michael J. Murray, of Chicago (Richard E. Girard, Patricia J. Whitten, and John L. Wren, of counsel), for appellant.

Lawrence A. Poltrock, of Chicago (Wayne B. Giampietro and Gregory N. Freerksen, of DeJong, Poltrock & Giampietro, of Chicago, for appellees.

JUSTICE MORAN delivered the opinion of the court:

The circuit court of Cook County entered a declaratory judgment holding that the board of education of the city of Chicago (Board) had breached its collective bargaining agreement with the Chicago Teachers Union (Union) by closing schools on June 16, 1977, one day before the date provided by the official school calendar. In addition to an accounting, the court ordered the Board to pay employees covered by the agreement for the day on which schools were closed. The appellate court affirmed. 89 Ill. App. 3d 861.

There is but one question to be resolved: Are the employees covered under the collective bargaining agreement entitled to one day's salary?

On October 13, 1976, the Board and the Union entered into a collective bargaining agreement for the school year of September 1, 1976, to August 31, 1977. Provisions were made for annual salaries for teachers and career service employees. On February 23, 1977, the Board adopted a recommendation, for the purpose of reducing the deficit in the Board's budget, that allowed the general superintendent of schools to lay off employees for three days during June 1977. In a press release dated March 24, 1977, the superintendent announced that the "Chicago Public Schools will

close one day early in June rather than the three days originally contemplated." As stated above, the schools were then closed one day early, on June 16, 1977. The union sought arbitration, alleging that the one-day layoff violated its collective bargaining agreement with the Board. The Board brought an action to enjoin arbitration. The Union counterclaimed to compel arbitration and, by amendment, claimed breach of contract and sought declaratory relief and an accounting requiring the Board to pay its employees the one day's salary. The circuit court enjoined arbitration and entered the order described earlier.

As the appellate court noted, testimony before the trial court predominantly pertained to the financial condition of the Board and the circumstances surrounding the collective bargaining agreement. In short, the record reveals the Board had a budgeted deficit of funds for fiscal 1976-77 of approximately $115.3 million. This amount was comprised of a $63.3 million accumulated deficit plus a projected $52 million operating deficit. To permit the appearance of a balanced budget when appropriations for the total of the individual line items exceeded the anticipated revenue (see section 34—44 of the School Code (Code) (Ill. Rev. Stat. 1975, ch. 122, par. 34—44) requiring a balanced budget), the budgeted deficit was offset by two negative "pro-rata" line-item appropriations totaling $115.3 million. The pro-rata line item designations consisted of a negative $91.66 million appropriation, following a $506 million appropriation for teachers' salaries, and a negative $23.64 million appropriation, following a $132 million appropriation for civil service salaries. The above salary appropriations as well as the negative pro-rata appropriations were applied to the Educational Fund, the primary fund to which salary costs were charged.

The 1977 annual financial report shows that at the conclusion of the 1976-77 fiscal year, the Educational Fund had an operating surplus of about $13.2 million, represent-

ing revenues in excess of expenditures for current opera-
tions. During that same period, the Board reduced its
accumulated deficit by almost $17.2 million. The record
also shows that, out of $19.1 million the Board expected to
receive from State aid and taxes, only $1.4 million was
realized. The February 23, 1977, recommendation adopted
by the Board providing for a three-day layoff at the end of
the school term was one of the measures designed to
compensate for the discrepancy. This recommendation was
the second phase of a plan adopted by the Board directed at
eliminating the accumulated deficit, but the first time a
recommendation for an early school closing was adopted.
The annual financial statement showed that at the close of
the fiscal year the Educational Fund had a total deficit of
approximately $70.6 million. The record reveals it would
cost the Board about $2.8 million to pay the teachers one
day's salary.

The essential portions of the contract as it concerns this
review are:

### "ARTICLE 36-SALARIES

36—1. The annual salaries of all teachers and the
prorated monthly segments thereof are set forth in the
teacher salary schedules attached hereto as Appendix
A. Such schedules and all other provisions governing
compensation and remuneration contained in Appen-
dix A are hereby made a part of this Agreement.

36—2. The annual salaries of all career service
employees in the bargaining unit and the prorated
monthly segments thereof are set forth in the career
service salary schedules hereto attached in Appendix
A. Such schedules and all other provisions governing
compensation and remuneration contained in Appen-
dix A are hereby made a part of this Agreement."

Appendix A specifically incorporated salary schedules into
the contract. Schedule 1A provided for the "[b]asic schedule
of school month salaries and annual salaries based upon a
6-hour day during regular school term of 39 weeks for

regularly appointed members of the teaching staff \*\*\*."
(The annual salary included the payment of 10 days of
vacation so that it was based upon 41 weeks of pay for 39
weeks of employment.) In addition, paragraph 44—31 of
the agreement provided:

> "The BOARD shall maintain a school calendar in
> which: Employees scheduled for 39 weeks shall receive
> their annual salary (including vacation pay) prorated
> over 41 weeks (39 school weeks and two weeks of
> vacation). \*\*\*"

Finally, paragraph 36—3 of the agreement provided:

> "In accordance with the provisions of the School
> Code of Illinois, salary schedules and compensatory
> and remuneration provisions in this Agreement shall
> be subject to the terms, provisions, and conditions of
> the appropriations therefore contained in the fiscal
> 1976-77 annual and supplemental school budgets."

Section 3 of the Board's budget provided:

> "That the appropriations herein made for salaries
> and wages for officers and/or employees shall be
> regarded as maximum appropriations both as to the
> sum appropriated and the length of time for which the
> incumbent of each position is to be employed. No
> employee shall have the right to demand continuous
> employment and compensation by reason of the appro-
> priation if it becomes necessary to lay him off on
> account of lack of work or lack of funds."

The appellate court concluded that the collective bar-
gaining agreement guaranteed teachers an annual salary for
a 39-week school year, notwithstanding the limitation in the
annual budget to which the agreement was subject whereby
the Board reserved the right to lay off teachers because of
lack of funds. Because the appellate court concluded the
terms of the agreement were clear, it declined to consider
uncontroverted evidence that the Union requested a clause
in the contract or a written guarantee separate from the
contract assuring a full 39-week year, both of which were

refused. (After a third Union request for a written guarantee, the Board made the following statement, prepared by the superintendent, to the Union negotiating team: "Our top priorities are to maintain a full qualitative school year and to provide stability for a half-million school children, their parents, our staff members, and the citizens of the City of Chicago." The collective bargaining agreement was then executed by the parties.)

The appellate court further concluded that even if the contract did not unequivocally obligate the Board to pay annual salaries and if the agreement were subject to the introductory language of the budget, the contractual condition of "lack of funds" was not met in light of the current operating surplus of $13.2 million dollars and a layoff, therefore, was unnecessary. The appellate court also found that the Board did not improperly delegate its discretionary power to fix salaries of teachers and adopt a budget; rather, in its view, the Board exercised its discretion when it entered into the agreement. 89 Ill. App. 3d 861, 870.

On appeal, the Board presents two principal arguments. First, it argues that the one-day layoff of Board employees for economic reasons did not constitute a breach of the collective bargaining agreement. Second, the Board argues that it has discretionary power to impose a layoff for economic reasons which it exercised reasonably and which cannot be restricted by contract. The Union argues that the one-day layoff breached the agreement which provided for a guaranteed annual salary, that the contractual condition of "lack of funds" contained in section 3 of the budget was not met because the salaries originally appropriated in the budget more than covered the annual salaries of the bargaining unit members, and that the collective bargaining agreement constituted an exercise of discretion, rather than a delegation of the Board's power to fix teachers' annual salaries.

Because of the result reached, we need consider only

whether the Board has the discretionary power to impose a layoff for economic reasons that could not be restricted by the collective bargaining agreement in this case. In *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, and in *Board of Trustees v. Cook County College Teachers Union, Local 1600* (1976), 62 Ill. 2d 470, the union and board entered into a collective bargaining agreement whereby the discharge, demotion, or other involuntary change in the employment status of any teacher had to be preceded by an evaluation of the teacher's classroom performance. The board, without complying with the evaluative procedure clearly outlined in the agreement, terminated the teacher's services. In those cases, the School Code imposed upon the board the duty to appoint teachers (Ill. Rev. Stat. 1973, ch. 122, par. 10—20.7) and empowered it to terminate the employment of teachers by dismissal or the nonrenewal of probationary teacher's contracts (Ill. Rev. Stat. 1973, ch. 122, pars. 10—22.4, 24—11 through 24—15). In both cases, this court held these powers to be discretionary and nondelegable, and that a termination in compliance with the statute was valid even though the board failed to comply with the evaluation provisions of the collective bargaining agreement. *Board of Trustees v. Cook County College Teachers Union, Local 1600* (1976), 62 Ill. 2d 470, 476; *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, 130-31.

The above two cases do not, as the appellate court suggests, hinge on the fact that a third party, such as an arbitrator, was the object of the delegation of the board's discretionary power. In *Board of Trustees v. Cook County College Teachers Union*, no mention is made of an arbitrator. In *Illinois Education Association v. Board of Education*, this court reversed the trial court's decision in part, notwithstanding the lower court's holding that the arbitrator could not grant employment contracts as a remedy. This court

reversed because the trial court held that an arbitrator could require a reevaluation in accordance with the terms of the collective bargaining agreement. (62 Ill. 2d 470, 476.) The emphasis of this court's opinion was not on a third party (the arbitrator) being the object of the delegation of the board's power to renew a teaching contract, but on the impropriety of subordinating the board's power to the terms of a collective bargaining agreement.

In neither of the above cases did this court construe the board's agreeing to a provision allowing for classroom evaluation before a teacher could be terminated as an exercise of its discretionary power to hire teachers and to terminate their employment. Rather, the court concluded the contract provision had no effect on the discretionary powers granted to the board by the School Code. See *Lindblad v. Board of Education* (1906), 221 Ill. 261, 271; *Weary v. Board of Education* (1977), 46 Ill. App. 3d 182, 184-86; *Board of Education v. Rockford Education Association* (1972), 3 Ill. App. 3d 1090, 1093; *Elder v. Board of Education* (1965), 60 Ill. App. 2d 56, 68. As this court stated in *Illinois Education Association v. Board of Education:*

"Strict construction requires us to hold that neither the powers conferred nor the rights granted by section 24—11 were restricted or expanded by the provisions of paragraph M of Appendix XXX to the collective bargaining agreement." 62 Ill. 2d 127, 130-31.

In our judgment, the holdings in *Board of Trustees v. Cook County College Teachers Union* and *Illinois Education Association v. Board of Education* control this case. Here, section 10—19 of the Code grants school boards discretionary power to "specify a closing date earlier than that set on the annual calendar when the schools of the district have provided the minimum number of computable days under this Section [176 days of actual pupil attendance]." (Ill. Rev. Stat. 1975, ch. 122, par. 10—19.) Section

34—16 empowers the Board to prescribe the duties, compensation and terms of office of its employees. Section 34—18 provides:

"The board shall exercise general supervision and management of the public education and the public school system of the city, and shall have power:

1. To make suitable provision for the establishment and maintenance throughout the year or for such portion thereof as it may direct, not less than 9 months, of schools of all grades and kinds * * *;

* * *

8. Subject to the limitations in this Article, to * * * employ teachers and other educational employees and fix their compensation." (Ill. Rev. Stat. 1975, ch. 122, par. 34—18.)

Section 34—18 also provides:

"The specifications of the powers herein granted are not to be construed as exclusive, but the board shall also exercise all other powers that may be requisite or proper for the maintenance and the development of a public school system, not inconsistent with the provisions of this Code which apply to all school districts." Ill. Rev. Stat. 1977, ch. 122, par. 34—18.

Just as the board had discretionary power, derived from the Code, to terminate employees in *Illinois Education Association v. Board of Education and Board of Trustees v. Cook County College Teachers Union,* the Code empowers the Board to control budgetary considerations (see *Bond v. Board of Education* (1980), 81 Ill. 2d 242, 248), as well as specifically empowering it to set a closing date earlier than that set on the annual calendar, so long as the minimum number of days has been met. Like the powers granted by the Code in the above two cases, the Board's powers here are discretionary unto itself and may not be delegated. See *Lindblad v. Board of Education* (1906), 221 Ill. 261, 271; *Weary v. Board of Education* (1977), 46 Ill. App. 3d 182, 184-86.

The Board's action in closing schools one day early was in compliance with its power granted by the Code. The Board met the minimum time requirements for keeping schools open as established by sections 10—19 and 34—18(1). Further, in light of a huge accumulated deficit and a reduction in anticipated revenue from both State aid and local property taxes (reductions which were not contemplated at the time the collective bargaining agreement was executed), closing schools one day early pursuant to its statutory authority, on a day when students were scheduled for only two hours, was not arbitrary, discriminatory or unreasonable. See *Bagley v. Board of Education* (1981), 84 Ill. 2d 474, 479, citing *Richards v. Board of Education* (1960), 21 Ill. 2d 104, 109; *Bond v. Board of Education* (1980), 81 Ill. 2d 242, 246.

In this case, any terms relating to the length of the school term in the collective bargaining agreement were subject to the Board's statutory power to close the schools early. Inasmuch as closing the Chicago public schools one day early was effected in compliance with provisions of the Code, that action was a lawful exercise of the Board's discretionary power.

We note parenthetically that the Board's action in closing the schools was taken as a last resort in an effort to reduce the accumulated deficit. The Board instituted many other cost-saving measures before the school closing. This fact, combined with the explicit requirements of section 10—19 of the Code that the Board maintain a minimum term of 176 days of actual pupil attendance, and of section 34—18 that a school term in the Chicago public schools must be not less than nine months' duration, militates against the appellate court's concern about allowing the Board an unlimited opportunity to lay off teachers at any time because of its accumulated deficit.

We also note that, contrary to the finding of the appellate court, we find no clear intention on the part of the

Board to guarantee a 39-week school year. The collective bargaining agreement was subject to section 3 of the budget, which gave the Board the right to lay off employees "on account of lack of work or lack of funds." Moreover, section 10—19 of the Code, which is incorporated into the contract (see *Teschner v. Chicago Title & Trust Co.* (1974), 59 Ill. 2d 452, 458), enables the Board to specify an early closing. Further, the Board twice turned down requests by the Union to guarantee a 39-week school year. Thus, the collective bargaining agreement does not evince an intention on the part of the Board to exercise its discretion by agreeing to limit its statutory power to close the schools early.

Finally, after the Board filed its reply brief in this case, the Union filed a motion to strike the same. That motion, which was taken with the case, raises two essential points. First, the Union contends that it was a misrepresentation for the Board to assert that it, rather than the superintendent by virtue of his March 24, 1977, press release, closed the schools early. We find no merit to this contention. His action was taken pursuant to the Board's adoption of a recommendation specifically allowing him to lay off employees for three days during June 1977 for the purpose of reducing the deficit in the Board's budget. This was not a delegation by the Board of its power. Contrary to the Union's assertion, the Board, in its February 23, 1977, resolution, did take action to modify the annual calendar. Further, the reduction of the layoff from three days to one day was to the benefit of the employees covered in the collective bargaining agreement.

The Union also asserts that the Board, in contravention of Illinois Supreme Court Rule 341 (81 Ill. 2d R. 341), raised new issues for the first time in its reply brief. However, those issues were not considered in our determination of this case. Consequently, we deny the Union's motion to strike the Board's reply brief.

For the above-stated reasons, the trial court erred by ordering the Board to pay teacher's salaries for June 17, 1977. Accordingly, the judgments of the appellate and circuit courts are reversed.

*Judgments reversed.*

JUSTICE SIMON, dissenting:

I would affirm on the ground that the terms of the collective bargaining agreement are unambiguous as to the obligations of the school board: The contract was for an annual salary rather than a daily wage, so that the annual amount was due even if the Board did not use all the teaching services it was entitled to; and the Board has not overcome the Union's showing that there was no "lack of funds" such as would defeat the Board's promise to pay full wages. The majority opinion, rather than attempting to deal with the agreement on its own terms, elevates the Board's statutory "discretion" in managing its affairs to such an exalted status as to render the Board virtually incapable of entering into binding contracts. Such a broad view of discretion is not supported by the statutes involved in this case, and it has ominous implications not only for the Board's future ability to manage its affairs, particularly with respect to securing credit, but for the law of contracts generally.

The appellate court's opinion exhaustively demonstrates that the Board was contractually required to pay its teachers their full annual salaries, based on the regular 39-week year. (89 Ill. App. 3d 861.) The matter should end there.

As I understand the majority opinion, the problem is that the Board's discretion to lay people off is something that cannot be restricted by a collective bargaining agreement, regardless of what contract law might otherwise say about the validity of the agreement and regardless of the terms of the agreement. The unbridled discretion the Board

claims to have does not come from the agreement itself, for the agreement conditions the right to lay off on lack of work or lack of funds and thus requires at least some inquiry into whether either of these conditions is met. Rather, if from anywhere, it must arise from section 34—18 of the School Code, which provides that "[t]he specifications of the powers herein granted are not to be construed as exclusive, but the board shall also exercise all other powers that may be requisite or proper for the maintenance and the development of a public school system, not inconsistent with the provisions of this Code which apply to all school districts" (Ill. Rev. Stat. 1975, ch. 122, par. 34—18) and from section 10—19 of the Code, which gives the Board discretion to "specify a closing date earlier than that set on the annual calendar" when the schools have been open for the statutory minimum number of days (Ill. Rev. Stat. 1975, ch. 122, par. 10—19). Unbridled discretion in the Board results, according to the majority, even though neither section of the School Code says anything about collective bargaining agreements, or rights the Board may retain in derogation of its contracts, or anything about salaries.

I find nothing in either of these statutory sections which gives the Board the power to cut salaries at will in derogation of contracts or restricts the Board's ability to enter into bargaining agreements with employees, collective or otherwise, so long as the terms of the agreements do not exceed budgetary appropriations. In fact, the words "all *** powers that may be requisite or proper for the maintenance and the development of a public school system" would appear, if anything, to be a statutory license to the Board to exercise its discretion by contracting with employee unions, if it decides such contracts will improve morale and employer-employee relations and promote effective management and operation of the school system.

Collective bargaining has come to be a standard procedure in dealings between public bodies and their employ-

ees, and the legislature no doubt had this in mind as one of the necessary courses to be made available to the Board. The Board had the statutory "discretion" to enter into the collective bargaining agreement being challenged here. To say that this "discretion" allows the Board to do what it pleases in the name of good management, in disregard of its contract, is like saying that "freedom of contract" allows a person to do whatever he wants even after he has contracted with another. What happens in fact is that the discretion and the freedom to contract become subject to the provisions of the contract, and this applies to bargains entered into by public bodies as well as private parties. See *Arlington Heights National Bank v. Village of Arlington Heights* (1965), 33 Ill. 2d 557.

The majority opinion strongly relies on *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, and on *Board of Trustees v. Cook County College Teachers Union* (1976), 62 Ill. 2d 470, which was decided on the basis of *Illinois Education Association*, for the proposition that the school board cannot contract away its discretion to close schools early or fix salaries. Those cases, however, do not involve the power to close schools or fix salaries; they deal instead with the power to refuse to rehire or promote nontenured teachers from year to year.

The basis of the *Illinois Education Association* decision (and, indirectly, of *Board of Trustees,* which followed *Illinois Education Association*) was that the discharge of a teacher, unlike the decision to close schools early due to lack of funds, is the subject of a comprehensive statutory system. The legislature has decreed the status various teachers have, their rights, and what procedures are to be followed in discharging them. The legislature has covered the subject in depth as a matter of policy. The Board must be able to eliminate inferior teachers if it is to maintain the quality of the schools, and the necessary decisions about individual teachers can hardly be made in advance. The

legislature has struck an elaborate balance between that need and the opposing interest in job security. The Board is not permitted to contract away its essential powers and adopt a system in conflict with the one created by statute. The Board does not have authority to refrain from exercising its own discretion in discharging employees when occasion arises; it has a statutory duty to exercise that discretion to discharge, which it cannot abandon.

Obviously, however, the Board has authority to enter into some enforceable contracts. It must be able to order supplies on credit. Could the Board repudiate its contracts with suppliers on the ground that it does not need the supplies once it closes school early? Even the Board does not claim that it could have kept the schools open, accepted the teachers' services the last day, and then simply not paid for them. The majority is saying, in effect, that the Board may contract only to pay for teaching services by the day, not by the year. The statute does not say that, and maintenance and development of the school system do not require it.

In *Board of Trustees v. Cook County College Teachers Union* (1976), 62 Ill. 2d 470, 480-82, the court upheld a contractual provision requiring the board of trustees to offer any available summer work to its qualified teachers in strict rotation. Teachers who had been passed over in the rotation were held entitled to full pay for the jobs they should have been offered, even though they had not done the work. The court remarked that the board of trustees retained the power to decide what summer programs to offer and who was qualified to teach them, and the board of trustees did not argue that the complaining teachers were not qualified. Decisions about the details of which of several qualified teachers were to do the work and get paid did not have to be committed to the inalienable discretion of the Board in order to maintain the schools properly; those decisions, this court held, could be controlled by contract

and left to an arbitrator.

I believe the present case is more like the summer work rotation controversy than like the discharge controversy. Salaries are routinely contracted for, even by school boards. The Board does not have to, and is not authorized by statute to, change its mind at any moment about how much it will pay its teachers. Indeed, the point of the annual budgeting process mandated by law is that the Board's appropriations are not supposed to change from day to day, with the Board considering everything anew at each meeting; the Board is supposed to anticipate and stabilize its obligations at the beginning of the year. The Board has no duty to exercise continuing discretion to juggle salaries as the year progresses, and the contract it signed was not an illegal attempt to abandon any such duty. By signing a contract, the Board was not giving away future discretion; it was simply exercising its present discretion to set salaries. The Board had discretion to engage teachers and pay salaries by the year. That discretion could be exercised by contract. Having fixed annual salaries by contract, the Board has exercised its discretion as fully as is required by law, and it must abide by its decision. Compelling the Board to honor its promises does not deprive it of its lawful discretion. See *Arlington Heights National Bank v. Village of Arlington Heights* (1965), 33 Ill. 2d 557.

The Board is, of course, entitled to close schools early, to save whatever expenses it is obligated to pay only on a daily basis. But it cannot thereby repudiate obligations that are not determined by the length of the school year. If the Board contracts to pay a fixed annual salary, rather than a *per diem* wage, it has to pay the annual salary, school or no school, especially when, as here, the main reason for closing the schools was to avoid paying the salaries.

The Board seems to argue, and the majority opinion does not dispute, that there is some public policy which should exonerate a public body from contractual obliga-

tions when honoring them would endanger its financial position. Unfortunately good public policy in such a situation is not so easy to discern. Allowing the Board to breach some of its obligations on account of financial need might well foster an attitude that, since it is a public body, it should be able to repudiate its obligations towards other creditors when need arises. Such an attitude will result only in greater financial difficulty over time as creditors become wary of the school board and require better terms to compensate for the risk of extending credit under those circumstances.

The danger is especially great because there was no intrinsic link between the teachers' salaries and the Board's financial difficulties. The circuit court found that the fund out of which teachers' salaries were paid had an operating surplus. The appellate court determined that so long as that account had funds, the Board could not justify its action on the basis of lack of funds, a conclusion I believe was sound. The Board's troubles consisted of staggering deficits in other accounts hung over from previous years. Any other breach of contract would have been an equally plausible way of saving money. In addition, significant labor problems may arise from the majority's holding, even if it is limited to its facts. Teachers would become less willing to bargain with a body whose promises are not binding, and even when they do bargain, what prevents them from engaging in wildcat strikes of their own on the theory that, if the Board can renounce its agreements, so can the teachers?

The legislature's version of public policy is that the Board is not allowed to make contracts unless it has already appropriated the necessary money in its budget. Any contract in violation of this provision is void. (Ill. Rev. Stat. 1975, ch. 122, par. 34—49.) The legislature requires that the budget be balanced. (Ill. Rev. Stat. 1975, ch. 122, par. 34—44.) In other words, the Board members are supposed to know where the money is coming from before they

promise to pay it. The Board here did appropriate ample money for teachers' salaries, and in my view, the contract is therefore valid and enforceable. The Board's scheme of evading the balanced-budget requirement through unorthodox accounting procedures and then using the resulting insolvency as an excuse for escaping its obligations does not conform to the system the legislature has established for keeping the Board financially sound. This court should not sanction that scheme in the name of public policy.

Contract law was created to make legitimate expectations enforceable and thus encourage bargaining, which is the basis of our economic system. When a public agency is allowed to repudiate a contract, it loses some of the credibility it must have in order to continue its relationship with its employees. The ultimate loser is the public. Once the board of education signs an agreement and its obligations under the agreement come due, it is too late for it to raise "discretion" as an argument for nullifying the contract. In effect, the Board is now claiming the right to prefer some creditors over others, more or less as it pleases. I would not permit it.