THE BOARD OF EDUCATION, ARBOR PARK SCHOOL DISTRICT NO. 145, COOK COUNTY, Plaintiff-Appellant, *v.* NANCY J. BALLWEBER *et al.*, Defendants-Appellees.

First District (2nd Division)  No. 81-590

Opinion filed March 30, 1982.

Alan T. Sraga, of Anthony Scariano & Associates, P. C., of Chicago Heights, for appellant.

Lawrence Jay Weiner and Fredric Bryan Lesser, both of Lawrence Jay Weiner & Associates, of Chicago, for appellees.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, the Board of Education of Arbor Park School District No. 145 (the Board), filed suit against the Arbor Park Education Association, IEA-NEA (the Association), and its member teachers. Pursuant to a collective bargaining agreement, the Association and individual teachers had been seeking arbitration of three disputed matters. In its suit, the Board sought a declaratory judgment that the matters are not arbitrable. The trial court dismissed the Board's complaint for declaratory judgment. The Board appeals.

Although the disposition of this appeal will be controlled by the applicability of the arbitration clause in the collective bargaining agreement between the Board and the Association, it is necessary to review events leading up to that agreement. The teachers in the Arbor Park School District began the 1979-80 school year without a contract. On September 10, 1979, the teachers went on strike until September 21. Nine school days were lost to the strike. A contract, designated the Professional Negotiations Agreement (PNA), was executed on November 16, 1979. Although the Association's president and secretary signed the PNA on

behalf of the teachers, on the same day (November 16) the president sent a letter to the Board stating that the PNA did not accurately represent the agreement between the parties and the document was executed under "duress." The letter charged that the Board, in preparing the written agreement, had unilaterally changed certain terms of the parties' oral agreement.

Nevertheless, neither the Board nor the Association disputed the validity of the agreement during the remainder of the school year. In fact, both parties acted in conformity with the agreement in the handling of the three grievances that are at the core of the instant litigation. The PNA defines a grievance as "a complaint that there has been an alleged violation, misinterpretation, or misapplication of any of the provisions of this Agreement." The PNA provides a five-step grievance procedure; the fifth step is submission to arbitration. The first of the relevant grievances was filed on December 16, 1979, by Robert McGaghie. McGaghie was a teacher with 30 hours of additional college credit which, under prior collective bargaining agreements, put him on a higher salary track. The PNA as executed did not contain a "+ 30 hours" salary track. McGaghie demanded arbitration after the Board denied his grievance.

The second grievance was filed on February 18, 1980, by JoAnn Holba, the president of the Association. Holba filed this grievance in response to a sick-leave policy statement issued by the Board on December 12, 1979. The grievance is specifically addressed to three clauses in the Board's policy statement:

"6. Certified staff members reporting sick for three or more consecutive days must submit a physician's certificate upon returning to work.

7. Excessive use of sick days may be cause for an individual conference or a request for a physical examination or other remedies at the discretion of the Superintendent.

8. Illegal use of sick days shall be considered as a breach of contract and may be cause for dismissal."

The PNA as executed contains a provision for sick leave. This provision does not include the clauses quoted above. The Holba grievance asserts that the Board is attempting to unilaterally modify the collective bargaining agreement.

The third grievance was filed on May 19, 1980, by the Association and 50 individual teachers. On April 3, the Board had voted to end the school year early (on June 6, 1980) and to "dock" the teachers three days' pay. This closing date provided 173 days of pupil attendance, rather than the 176 days required by the School Code. (See Ill. Rev. Stat. 1979, ch. 122, par. 10—19.) The PNA provided that teachers who were absent for the first three days of the strike (September 10, 11, and 12) would not be

paid for those days, but the end-of-year docking was in addition to that agreed upon in the PNA. The Association argues that the Board's action amounts to an illegal pay cut in violation of the contract.

The case at bar arose when the Board filed a complaint to foreclose arbitration of the three grievances. The first count of the complaint argues that the PNA is invalid and, as a result, there is no basis for arbitration. Count II argues that the sick leave policy is inarbitrable because it is a matter within the nondelegable discretion of the Board. In count III, the Board claims that the docking is inarbitrable because the Association seeks pay for days when the teachers did not work and such payment would violate public policy. The trial court dismissed the complaint and ordered that the grievances proceed to arbitration.

■■■ We note at the outset that the Board has not specifically argued the inarbitrability of the McGaghie grievance, except in the context of count I (*i.e.*, if the contract is invalid, no grievance or arbitration procedure exists).[1] Therefore, if the contract is binding, McGaghie is entitled to arbitration. The Board has not alleged facts sufficient to impugn the validity of the PNA. The Board argues that the contract is void for want of mutuality of obligation. The principle of mutuality of obligation demands that a contract must bind both parties in order to bind either. (See generally 1A Corbin, Contracts §152 (1963).) The Board appears to argue that the Association's alleged rejection of certain terms of the PNA (in its letter of November 16, 1979) constitutes a refusal to be bound by the agreement, and if the Association is not bound there is no mutuality of obligation. The Board has confused lack of mutuality with lack of acceptance. The contract imposes obligations on the teachers and the teachers, provided they have accepted the contract, are bound by it. The Board's claim that the teachers have not accepted the contract is based on the Association's written complaint of "duress." Notwithstanding this objection, the Association executed the written contract. Where parties reduce their agreement to writing, there is a presumption that the writing expresses their mutual intentions, and this presumption does not yield unless evidence to the contrary is strong and convincing. (*Hardy v. Greathouse* (1950), 406 Ill. 365, 373, 94 N.E.2d 134.) The Association's written assent must therefore be presumed to express acceptance of the contract. The Board points to the claim of "duress," but duress renders a contract voidable, not void. (See *Butler v. Metz, Train, Olson & Youngren, Inc.* (1978), 62 Ill. App. 3d 424, 435, 379 N.E.2d 1255.) The Association, which raised the cry of "duress," now stands by its acceptance of the contract. We find

[1] Plaintiff's reply brief contains a perfunctory argument addressed to the inarbitrability of the McGaghie grievance. As plaintiff failed to raise the point in its appellant's brief, we consider the point waived. See Ill. Rev. Stat. 1979, ch. 110A, par. 341(e)(7).

that the Board has pleaded no facts which support the conclusion that the PNA is not a binding contract. Count I of the complaint was properly dismissed.

■■ Count II of the Board's complaint argues the inarbitrability of the Holba grievance, relating to the sick-leave policy. The Board cites section 10—20.5 of the School Code, which gives the Board the authority to "adopt and enforce all necessary rules for management and government of the public schools." (Ill. Rev. Stat. 1979, ch. 122, par. 10—20.5.) From this the Board concludes that it has discretionary power to adopt a sick-leave policy and cannot legally surrender that power to an arbitrator. If we were to accept the Board's reading of section 10—20.5, no contractual dispute would be arbitrable because any position taken by a school board could be asserted as a rule "for management and government of the public schools." It is true that certain decisions are, by statute, relegated to the nondelegable discretion of school boards. (See, *e.g.*, *Board of Trustees v. Cook County College Teachers Union, Local 1600* (1976), 62 Ill. 2d 470, 476, 343 N.E.2d 473 (appointment of teachers is a nondelegable duty; arbitrator has no authority to award employment contract as a remedy for a contractual violation); *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, 130, 340 N.E.2d 7 (dismissal of a probationary teacher is a discretionary, nondelegable power of the board); *Board of Education v. Johnson* (1974), 21 Ill. App. 3d 482, 494, 315 N.E.2d 634 (question of qualifications for teacher assignments is reserved to the board and is not a proper subject for arbitration).) We believe that the class of inarbitrable issues should be limited to those areas specifically reserved to school boards by the School Code. See, *e.g.*, Ill. Rev. Stat. 1979, ch. 122, par. 10—19 (requiring school boards to prepare annual calendars), par. 10—20.7 (giving school boards authority to appoint teachers and fix salaries), par. 10—22.4 (referring to dismissal of teachers).

■■■ The School Code's only reference to sick leave for teachers is in section 24—6. This section states, in part:

> "The school board *may* require a physician's certificate, or if the treatment is by prayer or spiritual means, that of a spiritual advisor or practitioner of such person's faith, as a basis for pay during leave after an absence of 3 days for personal illness." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 122, par. 24—6.)

This provision empowers the Board to require a physician's certificate upon returning to work after three days' sick leave. The statute does not, however, *require* the Board to demand medical certification. In executing the PNA, which contained a sick leave policy without the terms announced by the Board on December 12, the Board in effect made a decision permissible under the statute—a decision not to require medical

certification. The Association has the right to hold the Board to that decision for the duration of the contract. (*Cf. County of Will v. Local 1028, Will County Employees Union* (1979), 79 Ill. App. 3d 290, 297, 398 N.E.2d 139 (school board has discretion to set salaries and can incorporate its decision into a collective bargaining agreement; in that instance, enforcement of the salary schedule by an arbitrator is implementing the board's decision).) At the very least, the Board's new sick leave policy presents a question of whether that new policy is compatible with the PNA. We find that question appropriate for arbitration.[2]

■■ In the third grievance, the Association asserts that the Board's act of closing the schools early and docking the teachers three days' pay (in addition to the earlier docking) was a violation of the PNA. The closing date of June 6, 1980, left 173 pupil-attendance days on the calendar, three short of the 176 days required by the School Code. (See Ill. Rev. Stat. 1979, ch. 122, par. 10—19.) In docking the teachers three days' pay, the Board reduced the teachers' compensation to account for the shortened school calendar. The Board, citing section 10—19 of the School Code, argues that setting the school calendar is a matter within its sole discretion. The Board may be correct on that point. Nevertheless, the question is not whether the shortened school calendar presents an arbitrable issue but whether the reduction in salary is an arbitrable issue.

The fact that the reduction in salary followed an abridgment of the calendar is not wholly irrelevant, however. Our supreme court recently treated such a situation in *Board of Education v. Chicago Teachers Union, Local 1* (1981), 88 Ill. 2d 63. In that case, the supreme court identified a twofold issue: did the school board have discretionary power to close the schools one day early for economic reasons, and was that power restricted by the union's collective bargaining agreement. (88 Ill. 2d 63, 69.) The court observed that section 10—19 of the School Code grants school boards discretionary power to set a closing date earlier than that set by the regular calendar as long as the school year has the 176 required attendance days. (88 Ill. 2d 63, 71, citing Ill. Rev. Stat. 1975, ch. 122, par. 10—19.) The court concluded that section 10—19 should be read into the union contract and that the board's act of closing the schools early was a lawful exercise of its discretionary power. (88 Ill. 2d 63, 73.) The school board's withholding of salaries for the missed day was upheld.

The instant case differs from the *Chicago Teachers Union* case in two

---

[2] We note that the Association has asked this court to find that the Board's new sick leave policy is void because of a conflict with section 24—6 of the School Code, and arbitration is therefore unnecessary. The trial court, however, ordered the parties into arbitration and the Association has filed no cross-appeal from that order. Absent a cross-appeal, an appellee cannot challenge or attempt to modify the trial court's order on appeal. *DePhillips v. Mortgage Associates, Inc.* (1972), 8 Ill. App. 3d 759, 762, 291 N.E.2d 329.

important respects. First, the supreme court in that case stressed the budgetary considerations underlying the early closing date. In the case at bar, the Board has not contended that the reason for the early closing was economic. More importantly, the supreme court suggested in *Chicago Teachers Union* that the school board's discretion to close the schools early is limited by the 176-day attendance requirement. (88 Ill. 2d 63, 73.) In the instant case, the Board's action resulted in a 173-day school year, so the action was not within the range of unfettered discretion allowed by section 10—19.

The Board argues that if it is held to the contractually agreed-upon salaries, it is forced to either (1) extend the calendar to make up days lost to the strike (an infringement on its discretionary power to set the school calendar), or (2) pay teachers for days not worked (a violation of public policy when the lost days were caused by an illegal strike). The answer to the first objection is that the Board lacks discretion to set a calendar shorter than 176 days. The answer to the second objection lies in elementary contract laws. The Board (after the conclusion of the strike) agreed to pay the teachers a fixed salary. If there was an illegal strike (a fact conceded in the trial court by counsel for the Association), the remedy lies in the disciplinary procedures set out in the School Code. The Board's remedy is not to abrogate a valid contract while the teachers stood ready to perform. Unlike the situation in *Board of Trustees v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 386 N.E.2d 47, there has been no showing that the collective bargaining agreement favors striking teachers over nonstriking teachers. We see no basis for a finding that the contract, or the arbitration result sought by defendants, violates public policy. We hold that the Board's action in docking an additional three days' pay gives rise to an arbitrable grievance, and the trial court did not err in dismissing the Board's complaint that sought to foreclose such arbitration.[3]

The decision of the trial court is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.

---

[3] The Association has asked this court to enforce the salary provisions of the PNA without arbitration. As noted in footnote 1, the Association did not appeal from the trial court's order to proceed to arbitration. We therefore reject the Association's request.