(No. 56758.—

THE BOARD OF EDUCATION OF ARBOR PARK
SCHOOL DISTRICT NO. 145, COOK COUNTY, Ap-
pellant, v. NANCY J. BALLWEBER *et al.*, Appel-
lees.

*Opinion filed June 17, 1983.*

Anthony Scariano and Alan T. Sraga, of Scariano, Kula & Associates, P.C., of Chicago, for appellant.

Lawrence Jay Weiner and Fredric Bryan Lesser, of Weiner, Neuman & Spak, of Chicago, for appellees.

Thomas R. Miller, of Miller & Tracy Law Offices, P.C., of Monticello, for *amicus curiae* Illinois Association of School Boards.

JUSTICE CLARK delivered the opinion of the court:

On July 2, 1980, plaintiff, the board of education of Arbor Park School District No. 145 (hereafter the Board), filed a three-count complaint against defendants, Arbor Park Education Association, IEA–NEA (hereafter the Association), and its member teachers. The Board filed suit in the circuit court of Cook County seeking a declaratory judgment that no valid collective-bargaining agreement existed between the parties, or in the alternative, to stay arbitration of three grievances the defendants had filed.

Defendants filed a motion to dismiss the Board's complaint. After both parties submitted briefs there was a hearing, after which the circuit court dismissed the complaint. The circuit court found that both parties had entered into a valid collective-bargaining agreement and ordered the parties to arbitration on the three grievances that were filed. The Board appealed the circuit court's dis-

missal of its complaint to the appellate court. The appellate court affirmed the circuit court's dismissal of the Board's complaint and ordered the parties to proceed to arbitration on the three grievances. (105 Ill. App. 3d 412.) The Board appealed to this court, and we granted its petition for leave to appeal (73 Ill. 2d R. 315(a)).

The teachers in the Arbor Park School District began the 1979-80 school year without a contract. On September 10, 1979, the teachers went on strike until September 21, 1979. The Board kept the schools open for the first three days of the strike using substitute teachers. The other six days during the strike, the schools were closed.

On November 16, 1979, an agreement, entitled the "Professional Negotiations Agreement," was signed by the Board and the Association's president on behalf of the teachers. Earlier that day, the president of the Association had sent a letter to the Board stating that the agreement that was to be signed did not accurately reflect the true and complete understanding between the parties on three points. The letter also stated that the Association was signing the agreement "under duress in order to gain the other benefits and working conditions contained in the final agreement." After the delivery of the above-described letter, the Association and the Board signed the agreement.

On November 28, 1979, the Board sent a letter in response to the Association's letter. It stated in pertinent part:

> "The Board regards your signature on the Professional Negotiations Agreement for 1979-1981 as acceptance of the terms and conditions contained therein. We regret that we disagree with three (3) items contained therein, but we still regard your signature as acceptance of the terms of that Agreement as written. Therefore, the Board regards your alleged disputes with the salary schedule, extracurricular pay and docking for strike days/make-up days as closed."

Neither the Board nor the Association ever questioned

the validity of the agreement for the remainder of the school year, both parties acting in conformity with its terms and conditions. Even the grievances that are the subject of this litigation were handled in conformity with the agreement and processed to the point of arbitration. The agreement had provided for a five-step grievance process, the fifth step being submission to arbitration. All three grievances had proceeded to the fifth step.

The first of the three grievances at issue in this case was filed on December 16, 1979, by Robert McGaghie. McGaghie was a teacher with 30 hours of additional college credit which, under prior collective-bargaining agreements, put him on a higher salary scale. The agreement with which we are concerned here omitted the "+ 30 hours" salary scale. McGaghie sought arbitration of this matter after the Board denied his grievance.

The second of the three grievances was filed on February 11, 1980, by JoAnn Holba, president of the Association. Holba filed her grievance in response to a sick-leave-policy statement which the Board issued on December 12, 1979. Holba stated that the agreement that was entered into between the parties on November 16, 1979, contained a policy on sick leave and that the provision that was agreed upon in the agreement did not include three clauses that the Board issued in its December sick-leave-policy statement. The three clauses that Holba was contesting were:

> "6. Certified staff members reporting sick for three or more consecutive days must submit a physician's certificate upon returning to work.
>
> 7. Excessive use of sick days may be cause for an individual conference or a request for a physical examination or other remedies at the discretion of the Superintendent.
>
> 8. Illegal use of sick days shall be considered as a breach of contract and may be cause for dismissal."

Holba alleged that inclusion of these three clauses in the

December policy statement was an attempt by the Board to unilaterally modify the terms of the collective-bargaining agreement.

The third grievance was filed on May 19, 1980, by the Association and 50 individual teachers. On April 3, 1980, the Board voted to change the 1979-80 school calendar. The school year under the changed calendar was to end on June 6, 1980, and the teachers were to be docked three days' pay in addition to the three days they had agreed upon in the collective-bargaining agreement. The new closing date would provide for 173 days of pupil attendance, which the grievance claimed was in derogation of the minimum 176 days' attendance which was required under the School Code. (See Ill. Rev. Stat. 1979, ch. 122, par. 10—19.) The grievance was based on the fact that the docking of three days was an illegal pay cut in violation of the agreement between the parties. The agreement had provided that teachers who were absent for the first three days of the strike, the days when substitute teachers were brought in, would not be paid for those days. But the three additional days docking at the end of the year were not provided for, either in the agreement or in each teacher's individually executed "Statement of Salary and Benefits for Certified Employees."

The Board filed its three-count complaint in order to stay arbitration of the three grievances outlined above. The first count of the Board's complaint alleged that the agreement between the parties was invalid and, therefore, there was no basis for arbitration. Count II dealt with the sick-leave grievance, the Board alleging that the sick-leave policy was within the nondelegable discretion of the Board and thus inarbitrable. Count III concerned the three days of additional salary docking. The Board claimed that the grievance involving the docking was inarbitrable because the Association was seeking pay for days which the teachers did not work, and if the Board paid the teachers for

those days it would be a violation of public policy.

This appeal involves two main issues. The first issue to be decided is whether a valid collective-bargaining agreement existed between the parties. The second issue, which is contingent upon the first and can be broken into three separate parts, is whether, if there is a valid agreement between the parties, each of the three grievances which has been raised is arbitrable.

In count I of its complaint the Board alleges that no contract existed between the parties. We find that allegation to be contrary to the Board's own assertion in its letter to the Association dated November 28, 1979, and contrary to the Board's conduct in acting in conformance with the allegedly invalid agreement. It is true that the Association, prior to the signing of the agreement, claimed that they were under duress. However, the fact remains that the Association did sign the agreement, as did the Board. In response to the Association's letter which claimed duress, the Board wrote a letter stating that it regarded the Association's signature on the Professional Negotiations Agreement "as *acceptance* of the terms and conditions contained therein." The Board's letter further indicated that if the Association's signature was a rejection of the terms of the agreement and a counteroffer, the Association should be advised that the Board would take action to regard such action as unacceptable and would not, therefore, be bound by the terms and conditions of the agreement. There is nothing in the record to indicate that the Association ever intended its signature or its letter to be either a rejection or a counteroffer. In fact, after the Association received the Board's letter, both parties acted in conformity with the agreement as written.

"An agreement is a manifestation of mutual assent on the part of two or more persons." (Restatement (Second) of Contracts sec. 3 (1981).) "It suffices that the conduct of the contracting parties indicates an agreement to the

terms of the alleged contract." (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 331.) We find the parties' conduct in this case to be a manifestation of their mutual assent to the terms and conditions of the agreement.

As the appellate court correctly stated, "Where parties reduce their agreement to writing, there is a presumption that the writing expresses their mutual intentions, and this presumption does not yield unless evidence to the contrary is strong and convincing." (105 Ill. App. 3d 412, 415, citing *Hardy v. Greathouse* (1950), 406 Ill. 365, 373.) Since the Association signed the agreement, even after expressing dissatisfaction with three points, there is a presumption that the agreement reflects its intention to be bound by the terms and conditions as expressed therein. There is no strong and convincing evidence to the contrary. Thus, we affirm the circuit and appellate courts' dismissals of count I of the complaint and hold that a valid collective-bargaining agreement existed between the parties.

We must next consider whether the grievances, which were filed in accordance with the grievance procedure as set forth in the agreement, are subject to arbitration. The appellate court noted that the McGaghie grievance regarding the +30-hour salary scale was not addressed in a separate count of the Board's complaint. The inarbitrability of the McGaghie grievance was raised, if at all, in the context of count I. If the agreement was found to be invalid, as count I alleged, there would be no arbitration procedure and, consequently, the McGaghie grievance would be inarbitrable. The appellate court considered the inarbitrability of the McGaghie grievance to be waived since it was not argued in the appellant's brief. Rule 341 of our own supreme court rules states that "[p]oints not argued [in the appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." (73 Ill. 2d R. 341(e)(7).) Since we have found the contract to be binding in this case, and the Board has waived the issue of

the inarbitrability of the McGaghie grievance, we hold that McGaghie is entitled to arbitration on his grievance.

The inarbitrability of the second grievance relating to sick leave was set out in count II of the Board's complaint. The Board argued that the School Code grants it nondelegable discretion in adopting a sick-leave policy for its teachers and that the sick-leave grievance is therefore inarbitrable. In section 24—6 of the School Code, the Code provides:

> "The school board may require a physician's certificate, or if the treatment is by prayer or spiritual means, that of a spiritual advisor or practitioner of such person's faith, as a basis for pay during leave after an absence of 3 days for personal illness ***." Ill. Rev. Stat. 1979, ch. 122, par. 24—6.

When the agreement was signed by the Board and the Association it contained a provision relating to sick leave, provision No. 5. The Board, in this provision, did not require a physician's certificate or a spiritual advisor's certificate after an absence of three days for personal illness. The sick-leave provision in the agreement thus was different from the sick-leave-policy statement the Board announced on December 12, 1979. We agree with the Board's assertion that section 24—6 of the School Code gives the Board the discretion to adopt a sick-leave policy requiring medical or spiritual certification after an absence of three days. However, we do not agree with the Board that subsequent to entering into a valid collective-bargaining agreement which reflects its discretionary choice regarding sick leave, it can unilaterally change the terms of the agreement and not be subject to arbitration under the grievance procedure as set forth in the agreement. In the November 16, 1979, agreement there was a section entitled "VIII GRIEVANCE PROCEDURE." In that section it stated that "[a] grievance shall mean a complaint that there has been an alleged violation, *misinterpretation,* or misapplication of any provision of this agreement." (Emphasis added.) Holba's griev-

ance was based on the fact that the sick-leave policy statement that the Board announced in December substantially altered the previously agreed-upon provision relating to sick leave. Holba's complaint does present a legitimate "grievance" according to the definition as set forth in the agreement. The fifth step of the grievance procedure, as we have previously stated, provided for submission of the grievance to arbitration. The fifth step provides: "If the grievance is not resolved satisfactorily to the Arbor Park Education Association or the grievant within five (5) days after consideration by the Board, there shall be available a fifth step of impartial arbitration. The Arbor Park Education Association or the grievant may submit in writing a request to enter into such arbitration. The arbitration proceeding shall be conducted by an Arbitrator to be selected by the two parties within seven (7) days after said notice is given. If the two parties fail to reach agreement on an arbitrator within seven (7) days, the American Arbitration Association will be requested to provide an arbitrator in accordance with its Voluntary Labor Arbitration Rules. The decision of the Arbitrator will be binding on the parties." Since we have determined that Holba's complaint is a legitimate "grievance" it follows that her grievance is one that is arbitrable under the grievance procedure. We agree with the appellate court that, at the very least, the Board's new sick-leave policy presents a question of whether that new policy is compatible with the sick-leave provision in the agreement. Thus, we hold that the Board's unilateral change regarding its sick-leave policy presents an arbitrable issue.

In count III of the Board's complaint, the Board asserted that the third grievance filed by the Association, which related to docking the teachers three additional days' pay, was inarbitrable. The Board argued that section 10—19 of the School Code gave school boards sole discretion in setting a school calendar and therefore the grievance filed by the Association could not be decided by an arbitrator. The Board's

power to set the school calendar is not in dispute; section 10—19 does explicitly give the Board the power to set the school calendar. But, as the appellate court correctly stated, the real issue is whether the Board can dock the teachers an additional three days' pay without violating the collective-bargaining agreement. We agree with the appellate court that the salary-docking issue is an arbitrable issue.

The Board contends that *Board of Education v. Chicago Teachers Union Local 1* (1981), 88 Ill. 2d 63, supports its assertion that the third grievance is inarbitrable. We do not agree. In that case, we held that the school board had the "discretionary power to 'specify a closing date earlier than that set on the annual calendar when the schools of the district have provided the minimum number of computable days under this Section [176 days of actual pupil attendance].'" (88 Ill. 2d 63, 71, citing Ill. Rev. Stat. 1975, ch. 122, par. 10—19.) We held that not only did the school board have the power to close schools a day early in that case but also that the board could reduce the teacher's salary by the one day's pay. That case, however, is clearly distinguishable from the instant case for a number of reasons. First, the school board in that case had met the 176-day-minimum pupil-attendance requirement as set forth in section 10—19 of the School Code. Second, the collective-bargaining agreement in the *Chicago Teachers Union* case had a provision "which gave the Board the right to lay off employees 'on account of lack of work or lack of funds.'" (88 Ill. 2d 63, 74.) Also it should be pointed out that the Board's action in closing the schools a day early in that case was taken as a last resort to reduce the huge accumulated deficit that had occurred. The financial difficulties that the Board faced in that case had not been contemplated at the time the agreement was entered into. Given the financial situation in that case, we held that closing schools one day early on a day when students were scheduled for only two hours was not arbitrary, discriminatory or unreasonable. 88 Ill. 2d 63, 73.

We reasoned that the appellate court's concern in that case about allowing a school board an unbridled discretion to lay off teachers at any time because of its accumulated deficit was unwarranted because "the explicit requirements of section 10—19 of the Code that the Board maintain a minimum term of 176 days of actual pupil attendance, and of section 34—18 that a school term in the Chicago public schools must be not less than nine months' duration, militate[d] against the appellate court's concern about allowing the Board an unlimited opportunity to lay off teachers at any time because of its accumulated deficit." 88 Ill. 2d 63, 73.

In the instant case, the new closing date which was set by the school board did not provide for the minimum 176 days of pupil attendance. We do not agree with the Board that, because section 18—12 of the School Code provides for a reduction of State aid if a school district fails to provide for a minimum school term (see Ill. Rev. Stat. 1979, ch. 122, par. 18—12), a school board should not adhere to the minimum requirement of 176 days of pupil attendance if it is financially feasible.

The collective-bargaining agreement in the instant case did not provide for the layoff of employees in case of a lack of work or a lack of funds. The financial situation in the *Chicago Teachers Union* case, as we held, justified the one-day pay cut even under the terms of its collective-bargaining agreement. The three days' docking in this case was not provided for in the agreement, and the Board never asserted that its financial situation was such that it was necessary to dock the teachers. Since the collective-bargaining agreement only provided for three days' docking and the teachers were actually docked for six days' pay, we find that the Association and the teachers have raised an arbitrable grievance.

The circuit court ordered the parties in this case into arbitration on the three grievances. The Association did not file a cross-appeal on that order. So, as the appellate court correctly

held, the Association could not and cannot now challenge the order or attempt to modify it on appeal.

Accordingly, for all the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE UNDERWOOD, dissenting:

I cannot agree that any of the three matters which the majority determines are arbitrable may properly be the subject matter of a collective-bargaining agreement or submitted to arbitration.

Previous decisions of this court have made it unmistakably clear that the discretionary powers vested in school boards over teacher appointment, promotion, discharge, fiscal matters, including teacher compensation, and length of the school year are all nondelegable, nonarbitrable and subject only to the limits found in the School Code. (See *Board of Education v. Chicago Teachers Union, Local 1* (1981), 88 Ill. 2d 63; *Bond v. Board of Education* (1980), 81 Ill. 2d 242; *Board of Trustees v. Cook County College Teachers Union, Local 1600* (1976), 62 Ill. 2d 470, 476; *Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, 130; *Richards v. Board of Education* (1960), 21 Ill. 2d 104; *Lindblad v. Board of Education* (1906), 221 Ill. 261.) In my judgment those decisions simply preclude the result here reached by the majority. The court accomplishes its result by holding the nondelegability issue has been waived by the school board. That holding might be tolerable if the board were a private party neglecting to assert a right which was its alone, rather than an agency of government failing to assert on behalf of the public it represents a firmly established rule of law incorporating the declared public policy of this State; but that holding is not, in my judgment, appropriate here.

The profound and abiding public interest in our educational system is manifest in the statement in our 1970 con-

stitution that educational development is a fundamental goal of the citizens of this State and that the State is directed to "provide for an efficient system of high quality public educational institutions and services." (Ill. Const. 1970, art X, sec. 1.) This court has recognized that the responsibility of effectuating that mandate lies with the school boards. (*Bond v. Board of Education* (1980), 81 Ill. 2d 242, 248.) We recently noted that the waiver doctrine serves as " 'an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court.' " (*Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, 211, quoting *Hux v. Raben* (1967), 38 Ill. 2d 223, 224. See also *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.* (1978), 78 Ill. 2d 381, 384.) Accordingly, and in keeping with this court's general reluctance to allow inadvertence on the part of a public body to serve as the basis for impairing public interests as firmly established as the nondelegability of these powers, invocation of the waiver doctrine in this instance is, in my opinion, incompatible with our opinion in *City of Shelbyville v. Shelbyville Restorium, Inc.* (1983), 96 Ill. 2d 457. See, also, statement of general policy in *Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 447-48, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957; *City of Quincy v. Sturhahn* (1960), 18 Ill. 2d 604, 614; *People v. Brown* (1873), 67 Ill. 435, 438.

Among the duties of a reviewing court is the responsibility to maintain a sound and uniform body of precedent. (See, *e.g., Hux v. Raben* (1967), 38 Ill. 2d 223, 225.) In my judgment, the majority's conclusion that the board had irrevocably exercised its discretionary power over sick-leave requirements by entering into the collective-bargaining agreement is simply inconsistent with earlier decisions of this court which squarely held that such contracts could not affect the scope of the board's discretionary powers. In *Board of Trustees v. Cook County College Teachers Union,*

*Local 1600* (1976), 62 Ill. 2d 470, this court held that the board's failure to comply with the terms of a collective-bargaining agreement which required certain evaluation procedures to be carried out before a teacher's employment could be discontinued could not be the subject of arbitration because the board's discretionary power to appoint teachers could not be delegated. Similarly, in a decision handed down shortly before *Board of Trustees,* it was held that a school board's exercise of nondelegable discretionary powers in contravention of a collective-bargaining agreement was valid and that the agreement could not serve to restrict or expand the board's powers. (*Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127. See also *Board of Education v. Chicago Teachers Union, Local 1* (1981), 88 Ill. 2d 63, 71.) Since the board could not agree to a collective-bargaining agreement embracing nondelegable matters, I do not understand how entering into the agreement could constitute an irrevocable exercise of the board's discretion and subject to arbitration the propriety of any further exercise of its discretion.

Nor do I agree that the board's decision to eliminate three days from the school calendar, which necessarily resulted in a change of the number of days for which the teachers would be paid, could be the subject of arbitration. The majority states, inaccurately I think, that the issue does not concern the board's power to change the school calendar, but rather concerns whether the board can "dock" the teachers an "additional" three days' pay without violating the collective-bargaining agreement, which provided that they would be unpaid for only three of the days during which they were on strike. The board is expressly empowered to set the school calendar (see Ill. Rev. Stat. 1979, ch. 122, par. 10—19), and this court has squarely held that power to be nondelegable. (*Board of Education v. Chicago Teachers Union, Local 1* (1981), 88 Ill. 2d 63, 72.) The board's power to change the school calendar

is thus not susceptible to any restrictions contained in a collective-bargaining agreement. Although the teachers have a remedy for the board's apparent violation of the School Code's requirement of a minimum school calendar of 176 days, that remedy does not lie in arbitration.

CHIEF JUSTICE RYAN joins in this dissent.