Frank Luciani, Plaintiff-Appellant, v. Certified Grocers of Illinois, Inc., a Corporation, Defendant-Appellee.

Gen. No. 52,150.

First District.

February 10, 1969.

Rehearing denied March 19, 1969.

Gatenbey, Spuller, Law & Johnson, of Chicago (Andrew W. Gatenbey and Fred H. Law, Jr., of counsel), for appellant.

Rudnick & Wolfe, of Chicago (Harry L. Rudnick, Lewis G. Rudnick, Paul D. Rudnick, and David A. Hoffman, of counsel), for appellee.

MORAN, J.

This case involves a dispute over the construction of the bylaws of the defendant, Certified Grocers of Illinois, Inc., a grocery cooperative. Frank Luciani, owner of a grocery store and a former member of the defendant corporation, sued to recover patronage rebates in the amount of $23,241 allegedly due him for the fiscal year ending August 31, 1963. Defendant admits that Luciani would have been entitled to that sum had he kept the amount of money required by the rules of the cooperative in his deposit account. Defendant states that the average deficiency in plaintiff's deposit account during the year in question was 83.6% and therefore plaintiff's

patronage rebate should be reduced in that proportion so that the amount due plaintiff would be $3,812.

Plaintiff filed a motion for summary judgment in the amount of $23,241 plus interest, which the trial court denied. Defendant filed a motion for summary judgment which the trial court allowed, except that it entered judgment for $4,422 in favor of the plaintiff which represented the amount admittedly due plaintiff, plus interest. Defendant's motion in pertinent part reads as follows:

"1. Plaintiff Frank Luciani, doing business as Buy Wise Food Center, was a member of Defendant, Certified Grocers of Illinois, Inc., a grocery cooperative, during Defendant's fiscal year ended August, 31, 1963 and for several years prior thereto. On August 30, 1963, Plaintiff submitted his resignation from membership in Defendant effective September 3, 1963, which resignation was approved and accepted by Defendant.

"2. During Defendant's fiscal year ended August 31, 1963, Plaintiff purchased merchandise from various divisions of defendant aggregating $315,966.70, which would have entitled plaintiff to a patronage rebate of $23,241.00 had Plaintiff been in compliance with various sections of Defendant's By-Laws and Rules and Regulations, as hereinafter more fully described. . . .

"3. Defendant's By-Laws and Rules and Regulations (quoted haec verba in relevant part hereinafter) require each member of Defendant to maintain a cash deposit with Defendant in an amount equal to twice the average weekly purchases of the member from Defendant. Notwithstanding such requirement, Plaintiff's cash deposit was deficient throughout Defendant's fiscal year ended August 31, 1963, and the average deficiency during that

period was 83.6% of Plaintiff's required cash deposit. . . .

"4. Defendant's By-Laws and Rules and Regulations provide as follows in regard to the matters in issue in this cause (which quoted portions of the By-Laws and Rules and Regulations were in full force and effect at all times relevant to the controversy herein):

"BY-LAWS

"ARTICLE X

"PATRONAGE DIVIDENDS AND CASH DEPOSITS

"SECTION 1: Patronage rebates (also known as and sometimes referred to as 'patronage dividends') shall be paid to qualified participants as herein defined, in accordance with the following provisions:

"(A) A qualified participant is any member in good standing, except an associate member, who is of record as of the day fixed by the Board of Directors in order to qualify for participation in the net profits of a division. If no specific date for qualification is designated by resolution of the Board of Directors for any Division, the qualification date shall be the last day of the fiscal year for which the patronage rebate is paid.

"(B) The net profit of a division for any period shall consist of that portion of the gross income thereof remaining after deducting all expenses of the division, exclusive of any provision for Federal income taxes, and computed in accordance with the customs and practices of the corporation and sound accounting principles.

"(C) The amount of the patronage rebate for a designated period, to be paid to a qualified partici-

451

pant of a division, shall be based on and determined by dividing the total net sales of the division to the qualified participant during the period by the total net sales of the division during the period to all qualified participants of the division. The quotient thus obtained shall be that percentage of the total patronage rebate of the division to be paid to a qualified participant, which may be computed to the nearest $10.00.

"(D) Patronage rebates shall be determined on a divisional basis. The net profit of a division shall be rebated only to qualified participants thereof.

"The Board of Directors by resolution, shall determine that portion of the net income of a division to be rebated to the qualified participants thereof, as soon after the commencement of a fiscal year as is practical, and may at the same time or subsequently fix the period for which the patronage rebate shall be paid, the time or times of payment, the qualification date or dates, and such other provisions or conditions which may be proper or appropriate.

"(E) The patronage rebates payable to qualified participants may in the first instance be deposited in their respective deposit accounts. Immediately following such deposits in the deposit accounts, the accounting division of the corporation shall recompute the amount required to be maintained in the deposit account of each qualified participant based on average weekly purchases for a representative period and in accordance with deposit ratio as fixed by the Board of Directors. That portion of the deposit account in excess of the required amount shall be returned to the depositor thereof. If the deposit account is deficient the depositor thereof shall be immediately notified that it be paid forthwith. If the depositor shall fail to pay such deficiency within

60 days after notice, then for the period of the deficiency, which shall commence as of the last day of the fiscal year preceding the notice, the amount of the patronage rebate otherwise payable during the deficiency period shall be reduced in the proportion that the actual amount in the deposit account bears to the required amount in the deposit account.

"(F) This By-Law provision shall be and constitute a continuing obligation of the corporation to allocate and distribute to the members of the corporation at least annually and as provided herein all the corporation's net profits over and above such reasonable retentions for reserves, debts and growth as the Board of Directors may from time to time determine.

". . .

"Section 3: To assure the corporation's success, the corporation shall be operated in such manner as to minimize or entirely eliminate credit losses, and to that end all shareholders shall be required to maintain a cash deposit with the corporation in such ratio to average weekly purchases of each shareholder as the Board of Directors shall from time to time determine, provided, however, that the ratio to weekly purchases shall be uniform as to all shareholders, except that the Board of Directors may establish a minimum deposit applicable to all shareholders.

". . .

### "RULES AND REGULATIONS

"Deposit Account. Each member shall maintain a deposit account with the corporation in an amount of money equal to two times his average weekly purchases, excluding dairy and produce purchases, but in no event shall such cash deposit be less than $2,000.00. Under no circumstances may an order

in excess of the deposit account be shipped to a member except (in the direction of management) on a C.O.D. basis for the amount in excess of the deposit account. No interest shall be paid on deposit accounts.

"As soon as possible after the close of the fiscal year, the company shall determine the proper amount of a deposit account on the basis of the deposit account ratio as set by the Board of Directors.

"A member who opens one or more additional stores shall deposit a minimum of $2,000.00 for each additional store, subject to such adjustments as may be required upon analysis of the account of each such store, to be made on or about 60 days after such store's opening.

"The ratio of deposits to average weekly purchases may be increased or decreased by resolution of the Board of Directors.

"The deposit account of a member may be analyzed at any time to determine whether it is in the correct amount.

". . ."

Defendant's motion continues:

"2. Defendant's By-Laws at issue herein (Section 1, 1(E) and 3 of Article X; hereinbefore quoted in relevant part) and the Rules and Regulations promulgated thereunder (herein specifically paragraph 2 thereof; hereinbefore quoted in full), which By-Laws and Rules and Regulations constituted a binding contract between Defendant and Plaintiff during the time that Plaintiff was a member of Defendant (Article XV of Defendant's By-Laws; hereinbefore quoted in part), clearly set forth the Defendant's long-standing policy, and the long-standing contract between Defendant and each of its members, and among the members, that to be entitled

454

to a proportionate share of the earnings and profits of each division of Defendant from which a member buys during a fiscal year, such member must comply with the By-Laws of Defendant (Section 3 of Article X) and the Rules and Regulations promulgated thereunder (paragraph 2), which taken together required each member to maintain with Defendant at all times during the fiscal year ended August 31, 1963, a cash deposit equal to two times such member's average weekly purchases excluding dairy and produce purchases. This policy and contract further provided that to the extent that a member failed to maintain his required cash deposit, after being given notice of such failure and 60 days to correct same, such member's otherwise proportionate share of the earnings and profits of each division of Defendant from which it purchased during the fiscal year would be reduced by the proportion which the average deficiency bore to the average required deposit."

Plaintiff-appellant contends that the clear and obvious meaning of Article X, Section 1, Paragraph E, of defendant's bylaws is that the depositor is to be notified in the event that his deposit account is still deficient after there has been added thereto the patronage rebates earned by him during the fiscal year. Then, in accordance with the final sentence in that paragraph, the depositor is given 60 days after being notified in the foregoing manner within which to pay any such remaining deficiency. Such notice is authorized to be given only after the end of a particular fiscal year with regard to any deficiency determined to exist for a period commencing as of the last day of such fiscal year. He argues that the trial court should have granted his motion for summary judgment because defendant's bylaws authorize a reduction in patronage rebates only in instances where there is still a deficiency in the mem-

ber's deposit account after the defendant has first applied the patronage rebates earned by a member during a particular fiscal year toward any deficiency in his deposit account as of the end of the year.

Defendant argues that defendant's bylaws and rules and regulations contemplate the continuous maintenance of a cash deposit by each member of defendant; that plaintiff interprets two entirely separate provisions of X–1–E, so as to distort the meaning and intent of both; that the first provision merely grants defendant's management authority to deposit patronage rebates in the cash deposit accounts of each member. The second directs defendant's management to notify members whose cash deposits are deficient and to reduce the patronage rebates of members who fail or refuse, after such notice to cure such deficiency.

█ We do not agree with defendant's interpretation of X–1–E of the bylaws. There is no doubt that the words "such deficiency" contained in the last sentence refer to the deficiency previously mentioned in that paragraph, since the word "such" always refers to something that has gone before. The word "such" is defined as "of the sort previously indicated or contextually implied; before mentioned; previously characterized or specified; of the same kind or class as something mentioned." The People v. Mobile & O. R. Co., 374 Ill 376, at 383, 29 NE2d 604. The natural import of the language would limit its application to the language previously mentioned in the paragraph. The sense of the whole paragraph is that there can be no deficiency in the deposit account unless the amount required in the deposit account exceeds the patronage rebate. The last sentence has no meaning standing alone and has meaning only to that which goes before.

In Integrity Mut. Ins. Co. v. Boys, 293 Ill 307, 127 NE 748, the court said at 313:

456

"Section 15 would be operative as a restriction if the words 'such corporation' should be held to mean such a corporation as the corporations provided for in the preceding sections. Section 15 follows the fourteen previous sections, which relate only to corporations organized under the act, and by all definitions the word 'such' refers to something that has gone before. It may refer to a person or thing previously mentioned or may be used for purposes of comparison as to quality or character. 'Such corporation' would mean a corporation similar to or of the same class or organized for a like purpose as corporations organized under the act, but the natural import of the language used would limit its application to the corporations mentioned in the preceding sections. It would require the addition of something to change the direct meaning of the language employed, and where the effect would be to change existing rights and the intention is not clearly manifested that should not be done."

So in the present case it would require the addition of something to change the direct meaning of the words employed in order to apply the reduction provision of X–1–E as contended by the defendant. We observe that Section 3 of Article X provides that each shareholder should maintain a cash deposit based on weekly purchases as determined by the Board of Directors, but this section does not in any manner relate this requirement back to X–1–E. The words of a contract are to be understood in their plain and literal meaning although the consequences may not have been in the contemplation of the parties.

The crucial question here was the state of the deposit account after applying the credits due plaintiff on August 31, 1962. Before any reduction of plaintiff's proportionate share of earnings and profits may be imposed,

the condition of the deposit account on August 31, 1962 must be ascertained because the deficiency period in question here, as defined by X–1–E, runs from August 31, 1962, to August 31, 1963. The reduction provision may be exercised only when a deficiency results in a member's deposit account after his patronage rebates have been deposited therein and his required deposit amount recomputed. If plaintiff is to be refused his patronage rebates, it must be because his deposit account was deficient on August 31, 1962, or was determined to so be after an analysis shortly following the fiscal year ending August 31, 1962. The facts are silent as to the state of plaintiff's deposit account after the analysis following the fiscal year ending August 31, 1962. These facts must be presented before it can be adequately decided whether the reduction may be applied.

X–1–E also provides that a member must be notified of his deficiency and given sixty days to correct it before the reduction may be imposed. A factual determination of whether this notice requirement has been met must also be resolved before it is decided whether this reduction may be applied.

█ Defendant also submits that its uncontroverted affidavits establish that it has interpreted and applied its bylaws in prior years to plaintiff and to other members in precisely the same manner that it interpreted and applied them to plaintiff for the fiscal year ended August 31, 1963, and therefore its construction of the bylaws should be adopted. It is true that where there is doubt as to the meaning of a contract, the courts will look to the acts of the parties for aid in construction. However, when a contract is clear and unambiguous, the conduct of the parties cannot be used to prove that it means something different than it says. 17 Am Jur2d, Contracts, § 274, page 688. In our opinion the language of X–1–E is clear and unambiguous and

therefore the argument of defendant on this point is not tenable.

In the view that we take of this case, it will not be necessary to consider other contentions raised by the parties.

For the foregoing reasons the judgment of the Circuit Court of Cook County is reversed and this case is remanded to the trial court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

GOLDENHERSH and EBERSPACHER, JJ., concur.