**HARRIS BANK NAPERVILLE, as Trustee Under Its Trust No. 4729, Plaintiff,**

v.

**MORSE SHOE, INC., a Delaware corporation, Defendant.**

**No. 86 C 8688.**

United States District Court, N.D. Illinois, E.D.

July 18, 1989.

---

Robert Marks, Spencer J. Marks, Gilbert W. Gordon, Marks Marks Kaplan, Chicago, Ill., for plaintiff.

Michael H. Moirano, James E. Dahl, Robert E. Neiman, Dahl & Moriano, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

The facts and law applicable to this case are, for the most part, outlined in Magistrate Gottschall's typically thorough Report and Recommendation (attached as an appendix to this opinion) and will not be repeated in detail here. The court issues this order to discuss decisions issued after the Magistrate rendered her opinion and to supplement her recommended ruling on these motions.

The issue here is the interpretation of section 12.6 of the lease. Both sides contended (at least initially) that the language in the lease was unambiguous and, therefore, could be decided by this court as a matter of law. In the alternative, the plaintiff claimed that if the language was ambiguous, the extrinsic evidence was uncontradicted and supported its position that there had been a mutual mistake that could be corrected by reforming the lease; and finally, in its reply brief the plaintiff claimed that if the extrinsic evidence was conflicting, the question of the contract's interpretation was one for the jury and, therefore, both motions had to be denied.

As Magistrate Gottschall noted, a contract is ambiguous under Illinois law only if it is " '*reasonably* and *fairly* susceptible to more than one meaning.'" *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1334 (7th Cir.1988) (*quoting Lenzi v. Morkin*, 116 Ill.App.3d 1014, 1016, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (1983), *aff'd*, 103 Ill.2d 290, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984)) (emphasis added in *Metalex*). The complication, though, is how a court determines whether a contract is "ambiguous"—a question currently the focus of some debate in this circuit.

In its reply brief the defendant, relying on the Seventh Circuit's opinion in *Sunstream Jet Express, Inc. v. International Air Serv. Co.*, 734 F.2d 1258, 1268 (7th Cir.1984), conceded that a court could take into account extrinsic evidence to determine whether the lease was ambiguous. *See* Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 2. After the motions were fully briefed, though, the Seventh Circuit questioned the continued validity of its prior ruling in *Sunstream*. In *Metalex* the court noted that the traditional "four corners" or "plain meaning" test, under which a court could not consider extrinsic evidence in determining whether the contract was ambiguous, had been undermined by several Illinois appellate courts which held that a court could consider extrinsic evidence—cases that were cited with approval in *Sunstream*.

According to *Metalex*, however, after *Sunstream* the Illinois Supreme Court in *Rakowski v. Lucente*, 104 Ill.2d 317, 84 Ill.Dec. 654, 472 N.E.2d 791 (1984), "cast[ ] some doubt on this circuit's interpretation of Illinois law." 863 F.2d at 1335. In *Rakowski* the court held that when a contract is unambiguous on its face,

[b]oth the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence

or any other extrinsic aids.... "What the parties to a written contract may have understood as to the meaning of the language used is not admissible in evidence. The intention or understanding of the parties, when there is a written contract in evidence, must be determined not from what the parties thought but from the language of the contract itself." 104 Ill.2d at 323, 84 Ill.Dec. at 657, 472 N.E.2d at 794 (*quoting Saddler v. National Bank*, 403 Ill. 218, 228, 85 N.E.2d 733, 740 (1949)).

*Rakowski*, unfortunately, did not specifically hold that a court may not consider extrinsic evidence in determining whether a contract is ambiguous (although the Seventh Circuit deemed *Rakowski*'s language to be "fairly susceptible" to that interpretation, *see Metalex*, 863 F.2d at 1335) and the Illinois appellate cases since then have yielded conflicting results. *Compare United Equitable Ins. Co. v. Reinsurance Co. of Am.*, 157 Ill.App.3d 724, 730–31, 109 Ill.Dec. 846, 850–51, 510 N.E.2d 914, 918–19 (rejecting *Sunstream* approach), *appeal dismissed*, 117 Ill.2d 554, 115 Ill.Dec. 410, 517 N.E.2d 1096 (1987) *with Zale Constr. Co. v. Hoffman*, 145 Ill.App.3d 235, 241, 98 Ill.Dec. 708, 712, 494 N.E.2d 830, 834 (1986) (court may consider extrinsic evidence).[1] The Seventh Circuit in *Metalex*, therefore, declined to address this split in authority until the district court had had a chance to address the issue. 863 F.2d at 1336.

Since then the Seventh Circuit has attempted to clarify further its opinion in *Metalex*. In *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989), the court distinguished between two types of ambiguities: internal ("intrinsic") and external ("extrinsic"). An internal ambiguity is present when the agreement itself is unclear; an external ambiguity, on the other hand, is present when, "although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen." *Id.* Accordingly, parol (or extrinsic) evidence is

admissible to demonstrate that a contract is ambiguous, even when the contract has no intrinsic ambiguity, when "to persons knowledgeable about the circumstances in which the contract had been intended to apply the 'normal' reading might be nonsense." *Id.* at 621. The court further noted, however, that Illinois courts are more likely to allow extrinsic evidence when the contract is patently ambiguous than when an otherwise clear contract is ambiguous "to those in the know." *Id.*

The court then tackled the apparent "conflict" within the Illinois Appellate Court, labelling it a "pseudo-conflict" because most of the modern "four corners" cases stand for the "unexceptionable proposition that '[l]anguage in a contract is not rendered ambiguous simply because the parties do not agree on its meaning.'" *Id.* at 621 (*quoting Reynolds v. Coleman*, 173 Ill.App.3d 585, 593, 123 Ill.Dec. 259, 265, 527 N.E.2d 897, 903, *appeal denied*, 123 Ill.2d 566, 128 Ill.Dec. 899, 535 N.E.2d 410 (1988)). The court cautioned, though, that

[t]he fact that parties to a contract disagree about its meaning does not show that it is ambiguous, for if it did, then putting contracts into writing would provide parties with little or no protection.... *[T]he words of the contract are not lightly to be ignored. The nature of the offer of proof to show an ambiguity is therefore critical.* Although a self-serving statement ... that a party did not understand the contract to mean what it says (or appears to say) will not suffice, an offer to show that anyone who understood the context of the contract would realize it couldn't mean what an untutored reader would suppose it meant will.

*Id.* 877 F.2d at 621–622 (emphasis added; citations omitted). The court, however, did not need to resolve the so-called "conflict" because the contract at issue was ambiguous both intrinsically and extrinsically and, therefore, was to be interpreted by the trier of fact. *See id.; cf. Sonoco Bldgs., Inc. v. American Home Assurance Co.*, 877 F.2d 1350, 1353 (7th Cir.1989) ("In determining whether an ambiguity exists [in

---

1. Interestingly, the same judge wrote both opinions.

an insurance policy], we consider the subject matter of the policy, the facts surrounding its execution, the situation of the parties, and the predominate purpose of the policy, which is to indemnify the insured for loss."). *But cf. Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir.1989) ("[I]t is the lack of ambiguity within the express terms of the contract that forecloses any genuine issue of material fact.... If a district court determines that the pertinent provisions of the contract are unambiguous, it need not consider extrinsic evidence.") (citation omitted).[2]

This court agrees with Magistrate Gottschall that the lease in this case is, on its face, unambiguous. The lease provides that "[i]n the event any of the following stores ceases to be operated as such ...: the *Woolco Department Store* ..., all amounts which would be payable pursuant to this Lease ... shall be abated and instead, Tenant shall pay to the Landlord *as its total and complete rent for the remainder of the term of this Lease*" an amount equal to the minimum fixed rent or 4% of the gross monthly sales, whichever is less. Section 12.6 (emphasis added). First, and perhaps most obviously, the provision specifically and unambiguously states that once the triggering event takes place (whether it be the departure of the Woolco Department Store or a "Woolco-type" store), the tenant's rent abatement lasts "for the remainder of the term of [the] Lease." The provision says nothing about

a "rent revival"[3] in the event Woolco returns to the mall or another suitable anchor occupies the premises; nor does it provide that the minimum rent payment lasts only as long as "the duration of the condition which makes Section 12.6 applicable." Memorandum in Support of Plaintiff's Motion for Summary Judgment at 15. The plaintiff obviously does not dispute that Woolco's vacancy triggered the rent abatement, but it never satisfactorily explains away the unambiguous language that the monthly rent is the "total and complete rent for the remainder of the term."

Second, construing the lease in its entirety, the court also agrees with Magistrate Gottschall that the "as such" lenguage in section 12.6 refers to the Woolco Department Store operating *as the Woolco Department Store*. The language uses the full name of the store, reemphasizing the importance of the Woolco Department Store as the anchor tenant in the mall. In addition, there was no need to repeat the phrase "Woolco Department Store, 'being operated under such trade name,' " *see* section 2.3, since, as Magistrate Gottschall noted, "Woolco Department Store" adequately identifies the store. Moreover, had the parties meant "Woolco-type" store, as the plaintiff contends, they easily could have inserted that language.[4] Accordingly, no right of substitution (or "like use") appears, explicitly or implicitly, on the face of the lease.

**2.** Courts in this district for the most part have followed *Sunstream* without discussion of *Metalex. See, e.g., AnnTaylor, Inc. v. Worth Bank & Trust Co.*, No. 88 C 7655, slip op. at 3, 1989 WL 15963 (N.D.Ill. Feb. 17, 1989). *But cf. Harris Trust & Savings Bank v. Wayne J. Klein Corp. (In re Klein)*, 97 B.R. 394, 397 (N.D.Ill.1989) ("[*Rakowski*] merely held that where an agreement is 'comprehensive, precise and unambiguous,' the agreement, not the actual intentions of the parties, controls.") (*quoting Rakowski*, 104 Ill.2d at 323, 84 Ill.Dec. at 657, 472 N.E.2d at 794).

**3.** A rent revival clause (providing for the payment of reduced rent until, for example, "such time as a suitable substitute anchor occupies the premises") easily could have been inserted.

**4.** The plaintiff points to this "Woolco-type" language in § 9.4, the anticompetition clause. Re-

liance on this analogy, however, undermines the plaintiff's broader argument. The plaintiff's main argument is that since § 2.3 identifies the Woolco Department Store as the "store premises referred to ... by specific trade name being operated under such trade name," § 12.6's omission of that language is significant and implies a meaning other than "Woolco Department Store ... operated under such trade name." By the same token, however, by *not* identifying Woolco as a "Woolco-type of store" in § 12.6, the parties (according the logic of the plaintiff's argument) *must* have intended something other than a "Woolco-type" of store.

In any event, the plaintiff's reliance on § 9.4 is misplaced. There, the phrase "other types of store" has a meaning appropriate and peculiar to the anticompetition clause, which prohibits leasing of premises to other shoe stores, but excepts Woolco and similar types of stores (i.e., stores that do not sell primarily shoes) from this

Furthermore, this conclusion would not change even if this court were to consider the extrinsic evidence submitted by the parties. First, with respect to the permanency of the rent abatement, the plaintiff's proposed evidence would not simply "explain" an ostensible ambiguity in the language of the lease, but rather would nullify completely the unambiguous language in section 12.6 that the tenant's post-Woolco reduced rent would be "its total and complete rent *for the remainder of the term of this Lease.*"

Second, the nature of the plaintiff's offer of proof of extrinsic evidence does not rise to that level necessary to overcome the otherwise plain and unambiguous meaning of the language in the lease. As Magistrate Gottschall noted, Mr. Levine's affidavit addresses primarily *his* understanding of the lease and *his* understanding of the ostensible custom or trade usage regarding depletion clauses. The evidence is uncontradicted that when the defendant submitted the final draft of the lease, with the disputed depletion clause, the plaintiff did not object to the language; instead, Mr. Levine "read the abatement provision in accordance with [*his*] understanding of the agreement and the customary meaning of the key tenant clause in shopping center leases." Amended Affidavit of Donald G. Levine at 3 (filed May 7, 1987) (emphasis added). Although the parties at some point conceivably may have discussed various types of depletion clauses,[5] the fact remains that the defendant presented the plaintiff with a final draft of the lease containing the current depletion clause, and the plaintiff signed it without objection. Contrary to the plaintiff's claims, there is no indication of a "mutual mistake" allowing for reformation of the lease. Rather,

as Magistrate Gottschall noted, the plaintiff's argument boils down to one of unilateral mistake, which, in the absence of fraudulent conduct, is not sufficient to reform a contract.

In sum, even if extrinsic evidence is introduced, the lease is not "reasonably and fairly susceptible" to the plaintiff's interpretation, and it certainly is not rendered nonsensical under the defendant's interpretation, *see W.R. Grace*, 877 F.2d at 621, since even if the plaintiff can surmount the "as such" hurdle, it cannot overcome the language mandating a *permanent* reduction in the rent for the remainder of the lease. The plaintiff's extrinsic evidence amounts to little more than a "self-serving statement ... that [the plaintiff] did not understand the contract to mean what it says." *Id.* at 622. Furthermore, the plaintiff's appeals to "equity" and "fairness" are without merit. The plaintiff is not an untutored, naive layperson; rather, it is a sophisticated corporate entity that was represented by counsel throughout the negotiations. It therefore is bound by the contract that it signed.

Accordingly, the court overrules the plaintiff's objections, adopts the Report and Recommendation (as supplemented by this opinion), and grants the defendant's motion for summary judgment but denies that of the plaintiff. The court will enter a final judgment for the defendant and against the plaintiff.

## APPENDIX

December 22, 1988.

JOAN B. GOTTSCHALL, United States Magistrate.

## REPORT AND RECOMMENDATION

TO THE HONORABLE JOHN A. NORDBERG, one of the Judges of the United

---

restriction. By contrast, the principle of a similar "type" of store is neither necessary nor provided for in § 12.6.

**5.** The negotiations took place over an extended period of time: they began, at the latest, in November 1974; resumed sometime in September 1976 (when various types of depletion clauses allegedly were discussed); and culminated in the signing of the lease on January 20, 1977. Levine Affidavit at 2. During the course of

negotiations (especially protracted ones), the positions of both sides evolve and sometimes change drastically, with proposals and counterproposals being bandied about. Thus, the fact that the plaintiff may *at one time* have understood the defendant's position to be consistent with the one the plaintiff currently is espousing does not mean that this was the defendant's final position. The intention of the parties is embodied in the final written agreement, not in preclosing negotiations.

States District Court for the Northern District of Illinois.

In this one count Complaint in which plaintiff landlord seeks declaratory relief and rental payments, the controversy centers around the interpretation of § 12.6 of the lease of premises; that section provides for reduced and abated rent under certain specified circumstances. The issue is one of contract interpretation: whether defendant is entitled to continue paying only a reduced fixed rent under § 12.6 of the subject lease now that a Zayre store has begun to occupy premises formerly occupied by Woolco Department Store. Both parties have moved for summary judgment. The court recommends that plaintiff's motion be denied and defendant's motion be granted.

I. *Statement of Facts*

The essential facts are undisputed. Woolco Department Store was an anchor tenant [1] in a Wheaton shopping complex called the Woolco Shopping Center ("the Center") in which plaintiff's predecessor (LaSalle National Bank Trust No. 38301) owned premises to let as a retail store. Defendant entered into a lease for those premises in 1977 with plaintiff's predecessor for ten years with a five year renewable option. Defendant paid fixed rent. *See* Lease attached to Complaint for Declaratory Judgment and Other Relief at Art. IV, § 4.1. Defendant also had to pay three types of additional rent—a percentage rent based on its gross sales (Lease at Art. IV, § 4.1(b)); plaintiff's pro rata share of the Center's real estate taxes (Lease at Art. V, § 5.1); and its proportionate common area maintenance payments (Lease at Art. VI, § 6.3) (hereinafter referred to collectively as "the three additional payments").

The fixed rental payment was subject to reduction, and the three additional payments to abatement, pursuant to § 12.6 of the Lease, which provides in pertinent part:

*Depletion*—In the event any of the following stores cease to be operated as such (except for periods of renovation, restoration, alteration or the like) or the selling area thereof shall be reduced by more than twenty-five percent (25%): the Woolco Department Store (the initial square footage of the aforesaid stores are hereby deemed to be not less than 80,000[ ] ] or, in the event less than fifty percent (50%) of the leasable floor area in the Shopping Center as shown outlined in red on Exhibit "A" (exclusive of the aforesaid stores) shall be occupied by tenants which shall actively conduct or operate retail or service businesses, then upon the occurrence of any of the aforesaid events, and effective as of the date of said occurrence, all amounts which would be payable pursuant to this Lease including but not limited to those payable under or in respect of Articles IV, V and VI shall be abated and instead, Tenant shall pay to the Landlord as its total and complete rent for the remainder of the term of this Lease, as same may be extended, an amount equal to the lesser of (a) minimum monthly fixed rent or (b) four (4%) percent of gross sales for each month, which amount shall be reported and the rent payable monthly within thirty (30) days after the end of each previous month....

Defendant began operating its Fayva store on the leased premises in August 1977. Woolco Department Store vacated its premises in May 1982; the shopping center's name changed at that time. When Woolco vacated, defendant began to pay the reduced rent pursuant to the terms of the lease, and ceased paying the amounts set out in Articles IV–VI.

In October 1985, Zayre leased the vacant Woolco premises. Plaintiff then sought to have defendant resume its original obligations by requiring that it pay the higher fixed rent, as well as the three additional payments. This lawsuit followed defendant's refusal to agree to the revival of its original rental obligations.

---

**1.** Jewel Foods and Osco Drug may also have been anchor tenants. *See* Exhibit A to Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 3.

## II. *The Contentions of the Parties*

In moving for summary judgment, each party contends that the lease is unambiguous. In relying on what it contends is the clear language of the lease, defendant argues that the lease entitles it to continue paying a reduced rent, free of the three additional payments, despite the reletting of the vacant Woolco premises to Zayre. Plaintiff, on the other hand, argues that the original rental obligations were revived when Zayre rented those premises.

Plaintiff first contends that an examination of § 2.3 of the lease demonstrates that its interpretation is correct. That section requires that the tenant's obligation to pay rent commences when the Woolco premises are "operated under such trade name," such trade name specifically being Woolco. Plaintiff says that this language demonstrates that defendant's rental obligations commenced when the premises occupied by Woolco began to operate specifically as Woolco Department Store. If defendant's interpretation of § 12.6 that the premises must be operated specifically as a Woolco store is correct, plaintiff thus contends, then the parties would have followed "Woolco Department Store" in § 12.6 with "operated under such trade name." Plaintiff states, however, that the "operated under such trade name" language does not reappear in § 12.6 because no need for its inclusion existed—the language in § 12.6 ("as such ...: the Woolco Department Store") does not mean that the premises first occupied by Woolco need be operated specifically as a Woolco Department Store in order for the original rental obligations to be revived.

Plaintiff further contends that the phrase "as such," appearing in § 12.6, is equivalent in operation to "such use" or "like use." This means, plaintiff argues, that the original rental obligations are revived when a store of the same type as Woolco leases the premises.

In making this substitution argument, plaintiff refers to § 9.4 of the lease, a provision restricting the landlord's right to lease premises to other stores selling footwear, in which the language "the Woolco store and ... other types of stores ..." appears. Plaintiff says that the latter part of this phrase means types of stores other than the Woolco type. A Woolco type store, or a Woolco store, argues plaintiff, is a retail department store. "Woolco Department Store," on the other hand, means a specifically named store of a specific type, that specific type being a retail department store. According to plaintiff, "as such" precedes "Woolco Department Store" in § 12.6 to establish that the parties meant not Woolco specifically, but a specific type of store, that is, a store with a like use, i.e., a retail department store, with respect to the applicability of the modification. Therefore, plaintiff contends, the original rental obligations are revived when the premises are put to a use like that of the Woolco Department Store. Since Zayre is using the premises "like" Woolco, plaintiff seeks to persuade the court, the original obligations were revived when Zayre began to occupy the vacant Woolco premises.

In responding to plaintiff's substitution argument, defendant points out that nowhere in the lease is it stated that the original obligations are revived if Woolco Department Store reoccupies the premises, or that they are revived if some other retail department store like Woolco rents the premises. While plaintiff has described its right of substitution in its memoranda and in the Levine affidavit, defendant states that that right is not described in the lease. Defendant states that the court cannot rewrite the lease to give plaintiff a right of substitution to which it is not entitled by the unambiguous terms of the lease.

Plaintiff also contends that a proper interpretation of the lease is one that is equitable to both parties. Plaintiff argues that defendant's interpretation of the lease is harsh and untenable, that defendant's interpretation means that no matter how great its gross sales, defendant has no obligation to make the three additional payments once Woolco has vacated the premises, even if those premises are relet. Further, plaintiff points out that § 12.6 allows defendant to give notice of termination of

the lease within six months of the time when Woolco vacates the premises or when fifty percent of the remaining space becomes vacant. Plaintiff contends that under defendant's interpretation, the rent would be reduced and the additional payments abated even if the premises were relet during the time defendant decided whether or not to give notice of termination. Plaintiff states that this would be unfair, and that a reasonable construction must be adopted, rather than a construction that leads to an absurd result such as this.

In response, defendant first notes that the Woolco premises were vacant for three years before being relet to Zayre. Defendant, according to § 12.6, could decide whether to terminate only within the first six months of that period; it could not make that decision after that period, despite the fact that the anchor tenant premises remained vacant. Therefore, defendant argues, the arrangement was not one-sided since defendant had only a fixed period in which to make a termination decision.

Another argument raised by plaintiff in support of its interpretation is that the language of a lease is to be construed most strongly against its drafter, in this case defendant. Defendant responds that that rule of construction does not apply where a lease is unambiguous as in the instant case.

In the alternative, plaintiff contends that although the language of the lease is unambiguous, an examination of extrinsic evidence demonstrates the existence of a latent ambiguity in the lease. Plaintiff has submitted extrinsic evidence in support of its interpretation; defendant has submitted extrinsic evidence in response.

### III. *Summary Judgment Procedure*

The entry of summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate where the movant can "show that there is no genuine issue as to any material fact and that [he] is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). *See Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 841 F.2d 1347, 1352 (7th Cir.), *cert. dismissed,* —— U.S. ——, 109 S.Ct. 1, 101 L.Ed.2d 953 (1988); *Wiemerslage v. United States*, 838 F.2d 899, 902 (7th Cir.1988). The summary judgment procedure allows the court to assess the material proffered in order to see whether the parties have established the elements essential to their respective claims and defenses. *See Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 369 (7th Cir.1988). The entry of summary judgment is appropriate where a party fails adequately to demonstrate the existence of all essential elements on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The movant may submit a variety of materials in support of his motion. These include affidavits, pleadings and discovery materials. Fed.R.Civ.P. 56(c). *See, e.g., Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir.1985) (deposition), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); *Hermes v. Hein*, 742 F.2d 350, 354 (7th Cir.1984) (depositions and answers to interrogatories); *Richardson v. Penfold*, 839 F.2d 392, 394 (7th Cir.1988) (affidavits); *United States v. Kasuboski*, 834 F.2d 1345, 1347 (7th Cir.1987) (answers to interrogatories). The respondent has an opportunity to respond with materials which may show that a genuine issue with respect to a material fact does exist. *See Kasuboski*, 834 F.2d at 1350. The respondent must do more than simply assert the existence of a disputed fact issue. *Atchison, Topeka & Santa Fe Ry. v. United Transp. Union*, 734 F.2d 317, 320 (7th Cir.1984). Failure of the respondent to submit counter-affidavits or similar materials does not automatically result in the entry of summary judgment against him; it will be entered only where appropriate. Fed.R.Civ.P. 56(e).

Only reasonable inferences drawn from the facts may be considered. *Hermes*, 742 F.2d at 353. All doubts as to the existence of a genuine issue of material fact are resolved against the moving party. *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987); *Technograph Printed Circuits, Ltd. v. Methode Electronics,*

*Inc.*, 356 F.2d 442, 447 (7th Cir.), *cert. denied sub nom. Croname, Inc. v. Technograph Printed Circuits, Ltd.*, 384 U.S. 950, 86 S.Ct. 1570, 16 L.Ed.2d 547 (1966). Any disputed material fact must be outcome-determinative in the case under the applicable law. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984); *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

### IV. *Analysis*

The interpretation of a lease[2] is governed by the intention of the parties. *See McGinnis v. LaShelle*, 166 Ill.App.3d 131, 116 Ill.Dec. 631, 634, 519 N.E.2d 699, 702 (2d Dist.1988). The entire instrument is to be considered. *Id.* Where the language of a lease is clear and unambiguous, there is no need for judicial interpretation. *Hoffman v. Clark Street Roadhouse, Ltd.*, 79 Ill.App.3d 41, 34 Ill.Dec. 563, 564, 398 N.E.2d 238, 239 (1st Dist.1979). The clear and unambiguous terms of a lease must be given effect. *Stein v. Spainhour*, 167 Ill. App.3d 555, 118 Ill.Dec. 359, 361, 521 N.E.2d 641, 643 (4th Dist.1988). The court should not rewrite the terms of an unambiguous lease under the cloak of construction. *Id.*

This court finds the terms of the lease in the instant case to be clear and unambiguous: if and when Woolco Department Store vacated its premises in the Center, defendant's rental obligations were modified pursuant to § 12.6 of the lease. Woolco Department Store was specifically named—indeed, it was the only store triggering the first modification circumstance set out in § 12.6. Woolco Department Store did vacate its premises, triggering the modification. Defendant has been entitled to pay a reduced fixed rent, and to total abatement of the three additional payments since the premises were vacated by Woolco, and this entitlement continues throughout the remainder of the term of the lease. That this was the intention of

the parties is ascertainable solely from the lease itself. Therefore, the court recommends that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

### A. *The Language of § 2.3 Does Not Affect the Interpretation of § 12.6*

In accordance with the rule of construction requiring that consideration be given to the entire instrument, plaintiff has directed the court's attention to § 2.3 of the lease. That section provides in pertinent part that defendant's

> obligation to pay rent (except as otherwise specifically provided in this Section) shall not commence until ... [t]he premises shown on Exhibit "A" as Woolco (containing not less than 80,000 square feet) plus at least 50% of other leasable area outlined in red on Exhibit "A," (Exlusive [sic] of the demised premises and the aforesaid store) within 90 days of Fayva's opening are all open to the public during all normal business hours as retail or service businesses with those store premises referred to above by specific trade name being *operated under such trade name.* (emphasis added).

Plaintiff contends that this provision means that defendant's rental obligations commenced when the premises upon which the Woolco Department Store is to operate began to operate specifically as Woolco. This court agrees with plaintiff's interpretation of this section—the language is clear and unambiguous. Plaintiff further contends that if the language of § 12.6 is to be construed as it is in § 2.3 as referring specifically and solely to the use of the premises as Woolco, language similar to the language underscored above in § 2.3 would have been included in § 12.6. Plaintiff says it is improper to construe both sections as referring specifically to Woolco where one section actually contains language of specificity and the other does not. Since § 12.6 does not include language of specificity similar to that in § 2.3, plaintiff argues that defendant's contention that the

---

2. The rules of contract construction apply equally to written leases. *Feeley v. Michigan Avenue National Bank*, 141 Ill.App.3d 187, 95 Ill.Dec.

542, 545, 490 N.E.2d 15, 18 (1st Dist.1986). In this case, construction of the lease is governed by Illinois law. *See* Lease, Art. 12, § 12.11.

continuance of the modification is specifically dependent on the absence of Woolco is incorrect.

A review of the language in § 12.6, however, makes clear that there existed no necessity to include the phrase "operated under such trade" in that section because it already contains appropriate language of specificity: "In the event any of the following stores cease to be operated *as such* ...: the Woolco Department Store...." (emphasis added). The insertion of "as such" specifically identifies the Woolco Department Store operating upon the premises it leased from plaintiff. Read together, §§ 2.3 and 12.6 establish that both the commencement and continuation of defendant's original rental obligations depended upon *Woolco's* occupancy of the leased premises.

### B. *There Exists No Right of Substitution for a Like Use in the Subject Lease*

Plaintiff argues that the phrase "as such" in § 12.6 means that the rental abatement is no longer effective if the vacant Woolco premises become occupied by a store that uses those premises in a manner similar to the use put to them by Woolco Department Store. Woolco used the premises to conduct the business of a retail department store. Because Zayre is putting the premises to the same use, plaintiff argues that defendant's original obligations are revived.

In support of its "substitution" or "like use" argument, plaintiff relies on *Luciani v. Certified Grocers of Illinois, Inc.*, 105 Ill.App.2d 448, 245 N.E.2d 523 (1st Dist. 1969). In that case, the construction to be given the phrase "such deficiency" in corporate by-laws was at issue. The court defined "such" as referring "to something previously mentioned or something of the same kind or class as something mentioned." *Luciani*, 245 N.E.2d 523, 527. Plaintiff argues that in the instant case, by preceding "Woolco Department Store" with "as such," the effect is to mean a store with a like use.

Plaintiff contends further that an examination of § 9.4 of the lease supports its substitution argument. Section 9.4 prohibits the letting by landlord of premises to any store for the sale of footwear other than Fayva. Defendant has the option to terminate the lease if premises are leased to a competitor. Excepted from this restriction is "the sale of footwear in the Woolco store and incidental sale in other types of store, which shall constitute not more than 10% of their normal sales volume."

According to plaintiff, the reference to "Woolco store" in § 9.4 means the Woolco type and that "other types of stores" means stores other than the Woolco type. The Woolco type, according to plaintiff, is a retail department store. Plaintiff then argues that the reference to "Woolco Department Store" in § 12.6 is also merely a reference to a Woolco type of store.

The fundamental flaw with plaintiff's "like use" argument is that the concept of "use" appears neither explicitly nor implicitly in § 12.6. This court cannot rewrite the lease—its plain and literal meaning is clear: "as such" refers specifically to Woolco Department Store, not to any other store with a "like use," or a "like name" or "like owner," for that matter.

Furthermore, plaintiff's substitution argument has been previously rejected in this district. In *Northland Associates v. F.W. Woolworth Co.*, 362 F.Supp. 75 (N.D.Ill. 1973), the plaintiffs' predecessor in interest, owner of a shopping center, entered into a lease with defendant Woolworth, the corporate owner and operator of Woolco department stores. The original lease provided that the defendant tenant would pay a flat rent and an additional payment based on the percentage of its sales. The lease further provided that the predecessor landlord was required to lease a certain amount of ground floor space to specified types of "Additional Tenants." The defendant's obligation to pay rent abated until all that space was leased. The lease was subsequently modified: the tenant was to pay a reduced rent (1½% of its sales) during the interim period until the predecessor landlord met its additional leasing obligations.

*Northland Associates,* 362 F.Supp. at 76–77.

The plaintiffs purchased the shopping center. The tenant continued to pay the reduced rent because the additional floor space was not completely leased as provided in the lease. Meanwhile, a Montgomery Ward store rented space in the shopping center; the Ward store did not fit the definition of "Additional Tenants" set forth in the lease. *Id.*

The plaintiffs argued that the presence of Ward in the shopping center terminated the interim period, and therefore the tenant had to pay the rent originally contemplated by the lease. The plaintiffs argued that although Ward was not an "Additional Tenant," it was an adequate substitute to compensate for the shortage of "Additional Tenants." *Id.* at 77. The court, however, found that the lease as modified failed to provide a right of substitution in the performance of its terms, and therefore the interim period was not terminated by the presence of Ward in the shopping center. *Id.*

Plaintiff argues that *Northland*'s facts distinguish it from the case before this court. Plaintiff cites the fact that the *Northland* case did not involve the issue of rent abatement for the remainder of the lease term. That is true, but that fact fails to diminish the applicability of the *Northland* holding to this matter. Furthermore, plaintiff fails to address completely the reasoning used by the *Northland* court. Plaintiff says solely that "[t]he [Northland] [c]ourt held [Ward] could not be [substituted] because the new store was not within the center specifically delineated in the lease." Plaintiff's Response to Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment at 11. What the *Northland* court said, however, was:

> Not only does the lease as modified fail to provide for substitution in the performance of its terms, but the Ward store is not even within the retail classifications permitted by the lease for Additional Tenants. In fact, the lease prohib-

its the tenancy of other department stores in the shopping center....; thus, this [c]ourt cannot find that the opening of the Ward store on adjacent premises satisfied the conditions specified by Woolworth.

*Northland Associates,* 362 F.Supp. at 77–78. *Northland* is clear—for a right of substitution to exist, such right must be specified in the lease. In addition, *Northland* also clearly suggests that like performance (or even better performance) cannot be substituted for a specific requirement of a lease. In this case, there is no right of substitution in the lease, and plaintiff's argument must fail.

C. *The Court Need Not Construe the Language of § 12.6 Against Defendant–Drafter Because the Subject Lease Is Unambiguous*

Plaintiff argues that the lease should be construed against defendant because defendant drafted § 12.6. Language is to be construed against the drafter only where an ambiguity exists. *See First National Bank of Elgin v. G.M.P.,* 148 Ill.App.3d 826, 102 Ill.Dec. 259, 262, 499 N.E.2d 1039, 1042 (2d Dist.1986). The language of this lease is clear and unambiguous, and this rule of construction is inapplicable.

D. *No Latent Ambiguity Exists in the Subject Lease*

Plaintiff argues that if the literal words of § 12.6 are not read to require revival of defendant's original rental obligations upon replacement of the key tenant, then § 12.6 must be viewed as ambiguous, and extrinsic evidence considered on the subject of the parties' intentions. Besides restating the arguments, detailed above, that a literal reading of § 12.6 would work an inequitable result, plaintiff appears to suggest, by virtue of the extrinsic evidence it has offered, that such an interpretation would render the clause inconsistent with industry custom and usage and would frustrate the parties' intentions.

Plaintiff has submitted, as its only extrinsic evidence, the amended affidavit of Donald G. Levine, Surety Builders, Inc.'s representative during the Center negotia-

tions with defendant.[3] In his affidavit, Levine recalls discussing in 1974 with defendant's representative, Sy Bloom, the insertion of a "key tenant" or "depletion" clause. Levine stated that he agreed to the inclusion of "such a clause since key tenant clauses commonly provided either for an option to terminate or a suspension of rent until the key tenant is replaced." Amended Aff. of Levine at 2, Exhibit to Plaintiff's Memorandum in Support of its Motion for Summary Judgment. Levine further stated that he has thirty years of real estate experience yet does not recall ever seeing a lease containing a key tenant clause which permitted the lessee to continue paying a reduced rent despite replacement of the key tenant.

Levine further averred that in negotiations which took place in 1976, he met either with Bloom or with John Roberts, another representative of defendant. Levine averred that whichever gentleman he spoke to said that defendant wanted to include a term suspending rent until the replacement of the key tenant. Levine said that he agreed to the insertion of this term. *Id.* Levine said there was no discussion as to whether the three additional payments would remain abated were the key tenant replaced. *Id.* at 2–3.

Levine averred that *his* understanding of the depletion clause was that the original rent obligations were to be suspended until the replacement of the key tenant. Amended Aff. of Levine at 2. He stated that his understanding reflects "the customary meaning" of this type of clause in shopping center leases. *Id.* at 3.

Defendant submitted various exhibits supporting its contrary interpretation of the lease, including the affidavit of Alan Vuernick. Vuernick served as defendant's regional counsel during the negotiation process with plaintiff's predecessor. *See* Letter dated November 3, 1976, Exhibit to Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion

for Summary Judgment. Vuernick stated that it was his custom to propose a clause in which the original obligations are permanently suspended if the original key tenant vacates its premises. Aff. of Vuernick at 2, Exhibit to Defendant's Response to Plaintiff's Memorandum in Support of its Motion for Summary Judgment. If this type of proposal is unacceptable to the landlord, Vuernick stated that he would then try to negotiate a clause permitting revival under certain limited circumstances. Vuernick had no specific recollection of the relevant negotiations for the lease at issue here. Aff. of Vuernick at 2.

In interpreting a contract under Illinois law, a court must first decide if the contract is ambiguous, a question of law. *Metalex Corp. v. Uniden Corp. of America,* 863 F.2d 1331, 1332–33 (7th Cir.1988). Only if the court finds the contract ambiguous does a fact question arise for the trier of fact. *Id.* at 1333. *See City of Chicago v. Dickey,* 146 Ill.App.3d 734, 100 Ill.Dec. 412, 414–416, 497 N.E.2d 390, 392–394 (1st Dist.1986). An ambiguity can be found only if the language involved is reasonably and fairly susceptible to more than one meaning. *Metalex, supra* at 1333. *See Tishman Midwest Management Corp. v. Wayne Jarvis, Ltd.,* 146 Ill.App.3d 684, 102 Ill.Dec. 538, 541, 500 N.E.2d 431, 434 (1st Dist.1986).

A latent ambiguity exists where the language of a lease appears clear and unambiguous, but extrinsic evidence shows that in view of the facts and circumstances, the language actually is unclear. *American National Bank & Trust Co. of Chicago v. Olympic Savings & Loan Ass'n,* 60 Ill. App.3d 722, 18 Ill.Dec. 102, 104, 377 N.E.2d 255, 257 (1st Dist.1978); *DeKalb Bank v. Purdy,* 166 Ill.App.3d 709, 117 Ill.Dec. 606, 612, 520 N.E.2d 957, 963 (2d Dist.), *appeal denied,* 122 Ill.2d 572, 125 Ill.Dec. 215, 530 N.E.2d 243 (1988). The right to offer extrinsic evidence on the construction of an otherwise unambiguous contract is not without its limits; the latent ambiguity rule would be severely abused (as would

---

**3.** Surety Builders, Inc. was the leasing agent for the beneficial owners of the Center. Amended Aff. of Levine at 1, Exhibit to Plaintiff's Memorandum in Support of its Motion for Summary Judgment.

the judiciary) if every disgruntled party to a contract could without limitation challenge the intention of the parties as expressed in the contract. The extrinsic evidence presented to the court must demonstrate that there actually is a question about the language used.[4]

On a motion for summary judgment, the court must determine whether the extrinsic evidence submitted demonstrates an ambiguity that rises to the level of a genuine issue of material fact regarding the interpretation of the subject lease. *See, e.g., Cory v. Minton,* 49 Ill.App.3d 312, 7 Ill. Dec. 150, 153–154, 364 N.E.2d 311, 314–315 (1st Dist.1977). The existence of an ambiguity precludes the entry of summary judgment. *Stamatakis Industries, Inc. v. King,* 165 Ill.App.3d 879, 117 Ill.Dec. 419, 424–425, 520 N.E.2d 770, 775–776 (1st Dist. 1987).

The Restatement (Second) of Contracts sets forth reasonable requirements for reliance on trade usage as a construction aid. The trade usage must be so regularly observed "as to justify an expectation that it will be observed with respect to a particular agreement." 2 Restatement (Second) of Contracts, § 222(1) (1981). "[E]ach party [must] know[ ] or ha[ve] reason to know of the usage and neither party [can] know[s] or ha[ve] reason to know that the other party has an intention inconsistent with the usage." *Id.,* § 221.

Plaintiff's argument that industry custom supports a construction of § 12.6 different from its apparent meaning is not supported by the extrinsic evidence submitted. Plaintiff has not shown that its interpretation of § 12.6 is a construction regularly observed by the industry, or for that matter, by plaintiff itself. Plaintiff

has not submitted any documentation showing that rent abatement clauses like § 12.6 are uniformly understood to mean that abatement ceases when the identified tenant is replaced, nor has it cited any case law supporting such a construction of § 12.6. Plaintiff has also not shown that defendant was familiar with this alleged trade usage.

With respect to the argument that a literal interpretation of § 12.6 would frustrate the party's intentions, plaintiff's extrinsic evidence, Mr. Levine's affidavit, indicates that in discussions preceding the preparation of the written lease, Mr. Levine agreed to the insertion of a key tenant clause, believing it would include "a rent suspension right until the replacement of the key tenant...." Amended Aff. of Levine at 2. The lease, as reduced to writing, included no provision for rent revival.

While plaintiff never describes its argument in this way, plaintiff seems to be arguing that this is a case of unilateral mistake. *See generally Cummings v. Dusenbury,* 129 Ill.App.3d 338, 84 Ill.Dec. 615, 618–619, 472 N.E.2d 575, 578–579 (2d Dist. 1984). But in the absence of an allegation of fraud, bad faith or inequitable conduct, none of which is alleged here, a contract can be reformed only upon a showing of *mutual* mistake. *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1419 (7th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988); *Marengo Federal Savings & Loan Ass'n v. First National Bank of Woodstock,* 172 Ill.App.3d 859, 122 Ill.Dec. 749, 751–752, 527 N.E.2d 121, 123–124 (2d Dist.1988). Failure to read an instrument, giving rise to a unilateral mistake, cannot be asserted to invalidate a written contract. *Id.*

---

**4.** For example, a contract term may not be as specific as necessary, and thus give rise to a latent ambiguity. *See, e.g., DeKalb Bank v. Purdy,* 166 Ill.App.3d 709, 117 Ill.Dec. 606, 611–613, 520 N.E.2d 957, 962–964 (2d Dist.1988) (whether "corn" meant "wet corn" or "No. 2 corn" determinative of rent due). *See also* 4 Williston on Contracts 901 (3d ed.) (discussion of *Raffles v. Wichelhaus* (the *"Peerless"* ship" case)). Extrinsic evidence may also demonstrate a latent ambiguity where a contract clause is manifestly unreasonably restrictive. *See, e.g., Stamatakis Industries, Inc. v. King,* 165 Ill.App.3d 879, 117

Ill.Dec. 419, 424–425, 520 N.E.2d 770, 775–776 (1st Dist.1987) (restrictive covenant on its face prohibited former employee from engaging in all businesses in which employer had an interest, thereby forbidding employee from being employed in many occupations other than that in which he had been actually employed). A latent ambiguity may also exist where normal business practice or negotiations establish that the contract language is unclear. *See, e.g., Engineering Resources, Inc. v. Thermal Con-Serv Corp.,* No. 80 C 6069, slip op. at 3–5 (N.D.Ill. June 7, 1982) (Grady, J.).

There is a presumption, moreover, that when a contract is reduced to writing, it reflects the parties' mutual intent. *Board of Education of Arbor Park School District No. 145 v. Ballweber*, 96 Ill.2d 520, 71 Ill.Dec. 704, 706, 451 N.E.2d 858, 861 (1983). There is also a strong presumption against implying conditions that could have easily been included as terms of the contract but were not. *Braeside Realty Trust v. Cimino*, 133 Ill.App.3d 1009, 89 Ill.Dec. 25, 27, 479 N.E.2d 1031, 1033 (1st Dist. 1985).

Plaintiff is in essence claiming that because Mr. Levine agreed, in the course of negotiations, to a key tenant clause with a rent revival provision, the lease, which includes no such provision, should be construed to include it. But this is impermissible. Nothing in Mr. Levine's affidavit convinces this court that the writing is in any way ambiguous. Under Illinois law, where a contract is unambiguous, "the instrument itself is the only source of the parties' intentions." *Reichelt v. Urban Investment Company*, 611 F.Supp. 952, 955 (N.D.Ill.1985). *Accord Newman–Green, Inc. v. Alfonzo–Larrain R.*, 612 F.Supp. 1434, 1436–1437 (N.D.Ill.1985).

The extrinsic evidence presented fails to demonstrate that the ostensibly clear language of § 12.6 is in fact ambiguous. Plaintiff has failed to meet its burden of showing that there is a genuine issue of disputed fact concerning the language of § 12.6.

## CONCLUSION

For the reasons set forth above, this court recommends that plaintiff's motion for summary judgment be denied and defendant's motion for summary judgment be granted.

Counsel are given ten days from the date hereof to file exceptions to this Report and Recommendation with the Honorable John A. Nordberg.